Ed G. **BARHAM** and Martha F. **Barham**

v.

**UNITED STATES of America.**

Civ. A. No. 799.

United States District Court
M. D. Georgia,
Valdosta Division.

April 1, 1969.

44

R. Lamar Moore, Moultrie, Ga., for plaintiffs.

Sidney B. Williams, Attorney, Tax Division, Dept. of Justice, Washington, D. C., for defendant.

BOOTLE, District Judge:

This income tax case is composed of two unrelated issues, each of which will be discussed and disposed of separately below. The taxpayer's wife is a nominal party plaintiff since she filed a joint return with her husband for the relevant taxable years.

### Capital Gains Issue

One of the separate and distinct issues is whether the plaintiff, a lawyer practicing in Valdosta, Georgia, is entitled to capital gain treatment on his share of income received from the sale of partnership (or joint venture) real estate. Both parties have made motions for summary judgment, and the only evidentiary matter to be considered is the deposition of the plaintiff, Ed. G. Barham, upon which both parties base their motions.

Plaintiff's deposition reveals that in 1956, he entered into a joint venture with J. Ryce Martin and an unnamed party for the purchase, development and sale of certain tracts of land as residential subdivisions. Martin supplied 50% of the capital on the subdivision known as Dellwood Acres and the other two put up 25% each. Plaintiff later invested 50% of the capital in the subdivision

known as Hammock Hills. Profits were shared in the exact ratio of investments of capital. Title to the land was taken in the name of a "dummy" corporation for the purpose of keeping the property out of the estates of the investors in case any of them died, and the joint venturers held stock in the corporation in the proportions of their investments of capital.

All of the development, house building work and sales was left to Martin who was a large house builder doing business through his partnership entitled J. Ryce Martin and Sons. Sales were handled through this partnership. Plaintiff relied completely on Martin and devoted most of his time to his regular vocation, the practice of law.

The Valdosta law firm in which Barham practiced (and still practices) did a large real estate practice, and pursuant to an express or implied understanding, Martin would refer buyers of the property which their joint venture had purchased and subdivided (and buyers of other property as well) to this firm for the legal work in connection with the sales. As a result, Barham's firm handled at least 90% of the loan closings on property which their joint venture had developed.

Plaintiff testified on deposition that his primary purpose for entering into the joint venture was to enhance his firm's real estate practice. From this declared intention, plaintiff argues that as to him the real estate was a capital asset because it was not held "for sale to customers in the ordinary course of his trade or business" within the meaning of section 1221(1) of the Internal Revenue Code of 1954. The defendant's agent determined and the defendant now contends that the plaintiff's income from the joint venture for the years 1965 and 1966, $5907.00 and $5640.00 respectively, was ordinary income rather than capital gain.

■ It is undisputed that the primary business of J. Ryce Martin and Sons was the construction and sale of houses. It is clear that through the "dummy"

corporation the property was held by the partnership or joint venture between Barham, Martin and the unnamed party (section 761(a) defines the term "partnership" so as to include a joint venture). It is undisputed that the primary business, the only business, of this joint venture was the purchase, development, subdivision into lots and sale of this real estate. It is undisputed that this joint venture held this real estate for the primary purpose of selling it to customers in the ordinary course of its (the joint venture's) business. The real estate is to be considered partnership property for tax purposes. Section 702(a) provides: "In determining his income tax, each partner shall take into account separately *his* distributive *share of the partnership's* * * * (2) gains and losses from sales or exchanges of capital assets held for more than 6 months * * *." (Emphasis added.) Section 702(b) states the "conduit rule" of income taxation of partnerships as follows:

"The character of any item of income, gain, loss, deduction, or credit included in a partner's distributive share under paragraphs (1) through (8) of subsection (a) shall be determined as if such item were realized directly from the source from which realized by the partnership, or incurred in the same manner as incurred by the partnership."

■ The regulation elaborating on this section, Reg. section 1.702–1(b), shows the workings of the "conduit rule" in the following language:

"For example, a partner's distributive share of gain from the sale of depreciable property *used in the trade or business of the partnership* shall be considered as gain from the sale of such depreciable property in the hands of the partner. Similarly, a partner's distributive share of partnership 'hobby losses' (section 270) or his distributive share of partnership charitable contributions to organizations qualifying under section 170(b) (1) (A) re-

tains such character in the hands of the partner." (Emphasis added.)

The clear inference to be drawn from the Code sections and the regulation is that, as a general rule, for the purpose of determining the nature of an item of income, deduction, gain, loss or credit (in the hands of a distributee partner, as well as in the hands of the partnership before distribution), the partnership is to be viewed as an entity and such items are to be viewed from the standpoint of the partnership (or joint venture) rather than from the standpoint of each individual member. It follows that in section 1221(1) the words "his trade or business" mean the trade or business of the partnership, even though under section 701 partnerships are not liable for income tax. It is likewise clear that the trade or business of the partnership is an entirely separate and distinct thing from the motivation or purpose for which the partners cause the partnership to engage in such trade or business. Such *purpose* might be to aid other businesses of the partners or joint venturers or only for the purpose of enjoying the company of one another, whereas the *trade or business* of the partnership or joint venture is the trade or business for which it was organized and in which it engages. The trade or business of the partnership or joint venture in this case is the purchase, development, and sale of real estate regardless and independently of the business or professions of its members, and the real estate held by the "dummy" corporation for the joint venture was held for sale to the customers of the joint venture in the ordinary course of the joint venture's business.

The views expressed herein find support in Estate of Freeland v. Commissioner of Internal Revenue, 393 F.2d 573 (9th Cir. 1968) holding that the partnership intent is conclusive in characterizing the income for tax purposes, saying "it is the intent of the partnership, and not of any individual partner, that is in issue according to the Internal Revenue Code." 393 F.2d at 584. See also Fishback v. United States, 215 F. Supp. 621 (D. S.D.1963) wherein the court said:

"The Court is of the opinion that a joint venture for the development and sale of the property did exist between the parties. * * * *The property, although never formally transferred or deeded to the joint venture as such, became property held in the ordinary course of business by the venture and lost its character as a capital asset.*" 215 F.Supp. at 626 (Emphasis added.)

Two cases relied upon by the plaintiff, United States v. Rosebrook, 318 F.2d 316 (9th Cir. 1963), and Riddell v. Scales, 406 F.2d 210 (9th Cir., January 22, 1969), are from the Ninth Circuit (as is *Freeland*) and are distinguishable from that case. *Freeland* distinguished *Rosebrook* as follows:

"There, the taxpayer sold a one per cent interest in land which had originally been purchased by her father in the name of a trust having her as beneficiary. Although the interest had been committed to a joint venture, it was directly owned by the taxpayer, who was a tenant in common; under section 1221 of the Code, therefore— and especially since she had succeeded involuntarily to ownership of the land and participation in the joint venture —the court looked to her purpose rather than to that of other participants in the venture, and ruled that she had held the land as an investment. Here, both essential elements of the factual situation in *Rosebrook* —direct ownership and involuntary participation in the joint scheme—are absent. Petitioner's tax liability is clearly governed by the purpose of the partnership." 393 F.2d at 584.

In *Riddell* only one piece of real estate was handled by the joint venture and it was neither subdivided nor developed by the venture. Thus, there the joint venture itself was not conducting a real estate business. The court said:

"In the present case the operations of the joint venturers were restricted to those necessary to the realization of a

profit on a speculative investment by the taxpayers. The land was neither subdivided nor developed by the joint venture. The trustee, representing the joint venturers merely negotiated the agreement with Kearney Park, assisted in the completion of the sale to the Navy, and distributed the amount realized on the transactions to the beneficiaries of the trust." 406 F.2d at 213.

It is therefore the conclusion of this court that, with respect to the capital gains issue, there is no genuine issue as to any material fact and that the defendant is entitled to judgment as a matter of law. Defendant's motion for summary judgment as to this issue is granted. Since the foregoing considerations control the disposition of this case on the capital gains issue, it is not necessary for this court to pass on the contention of the government that the income derived from the joint venture is ordinary income by virtue of the rule stated in Corn Products Refining Company v. Commissioner of Internal Revenue, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955).

### Tree Farm Expense Issue

■ This issue likewise involves the calendar years 1965 and 1966 and arises by virtue of the plaintiff's claim that he is entitled to deduct costs in the total amount of $2249.00 incurred in clearing unwanted oak trees and brush (with no commercial value), from around young but well established pine trees growing on his tree farm. The government contends that such "brush control" activities were carried out in order to improve the pines and promote their long-term growth and enhancement and that such improvements are *permanent* in nature within the meaning of section 263(a) of the Internal Revenue Code of 1954 and are thus capital improvements the cost of which should be added to the basis of the pines (capitalized) under section 1016 and recovered through depletion when the timber is harvested. Both sides have moved for summary judgment on the basis of the affidavit and depositions on file, all of which were supplied by the taxpayer.

This court has determined that plaintiff's motion for summary judgment should be granted.

The basic statutory provisions involved are sections 162(a) and 263(a). Section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business."[1] Section 263(a) disallows any deduction for amounts paid out "for permanent improvements or betterments made to increase the value of any property or estate."

The affidavit of forestry expert Gene Harris (paragraphs 6 and 7), the deposition of Harley Langdale, Jr., President of The Langdale Company (pages 7, 8, 9, 11 and 12) and the deposition of the taxpayer, Ed G. Barham, (pages 18, 19 and 21) establish beyond dispute that expenditures for the eradication of oak trees and bushes and other undergrowth are common and economically beneficial expenditures in the tree farming business. There is thus no doubt that the taxpayer is entitled to take the expenditures for brush control or oak eradication into account. The dispute centers around the manner in which the taxpayer is entitled to take the expenditures into account.

In Revenue Ruling 66–18, C.B.1966–1, 59 advice was requested concerning tax treatment of expenditures incurred in the cultivation of Christmas trees as a trade or business. The trees were never harvested until they were more than 6 years old. Among the expenses considered in that ruling are "weeding" expenses described therein at page 60 as follows:

"Weeding, or cleaning, is a silvicultural operation employed in young established stands to free small trees

[1]. If the taxpayer were not in the trade or business of tree farming but merely held the property for the production of income, then these same items of expense could be deducted under section 212.

from weeds, vines, etc., and to provide better growing conditions by liberating crop trees from other trees of a similar age but of less desirable species. It is sometimes done, especially in plantations, by cultivating between the rows or sometimes by spraying with selective herbicides. Noncommercial thinning is the removal of excess trees in immature stands to give the remaining trees room to grow."

In discussing the proper tax treatment of these expenditures the Internal Revenue Service at page 61, said:

"The expenditures for silvicultural practices such as weeding and noncommercial thinning are incurred after the trees become established and before they are ready to be cut. Such expenditures are in the nature of maintenance charges and are deductible as ordinary and necessary trade or business expenses."

In the present case the pine trees may be harvested as early as 12 years after planting, or they may not be harvested until 30 years after planting depending upon rate of growth and whether they are cut for pulpwood or saw logs. This fact is no basis for failure to apply Revenue Ruling 66–18 to this case. The uncontradicted affidavit of the taxpayer's forestry expert, Gene Harris, establishes beyond doubt that in the tree farming business the eradication of competing vegetation from around the small pines is a silvicultural maintenance procedure substantially identical with that found in Revenue Ruling 66–18. That affidavit reads in part:

"7.

This [Timber Stand Improvement] work is regarded in forestry circles as customary annual expense to tree farmers, and is both an ordinary as well as a necessary expense in tree farming. In forestry, this is virtually a necessary expense for the management, *maintenance* and conservation of a stand of pine trees.

"8.

In conclusion, I can best illustrate what I have attempted to set forth in this affidavit by comparing this [Timber Stand Improvement] work which Mr. Barham has done as 'weeding trees' just like a row-crop farmer weeds his cotton, corn or peanuts. Some foresters call this 'brush control'" (Emphasis added.)

Revenue Ruling 66–18 therefore controls the disposition of the expense issue in this case.

The result reached here is indirectly supported by Estate of Richard R. Wilbur, 43 T.C. 322 (1964), which involved an election under Reg. 1.162–12 to treat as capital outlays certain farm expenditures made prior to reaching the productive state *where such expenditures would otherwise be considered as deductible expenses* (Thompson and Folger Company ·v. Commissioner, 17 T.C. 722 (1951)). The court at 323–24 noted that expenditures subsequent to the original planting of orchards for irrigation, *cultivation,* pruning, fertilizing, spraying, and *other care of the trees* are known as cultural practices expenditures which, although they bear a similarity to capital outlay, are normally deductible as ordinary and necessary expenses. *See* 4A Mertens, Law of Federal Income Taxation section 25.124 at 515. The uncontradicted affidavit of the taxpayer's forestry expert establishes beyond doubt that in the business of tree farming the eradication of scrub oaks, etc., is a cultural practice within the class of those practices enumerated in *Wilbur.*

The government contends that the brush control expenditures involved in the case at bar are not annual in nature and that the benefits flowing from these expenditures will thus extend several years into the future to be finally reaped when the trees are cut at ages varying from 12 to 30 years. However, the same may be said of some of the expenditures allowed by the Commissioner as deductions in Revenue Ruling 66–18. The government's argument merely points out the capital characteristics of these brush removal expenditures which in varying degrees are common to many cultural practices. It is for this reason

that Reg. 1.162–12 provides for an option to capitalize the cultural practice expenditures. *See Estate of Wilbur, supra.*

In addition to the supporting authorities cited herein, see Ransburg v. United States, 281 F.Supp. 324 (S.D. Ind.1967) which goes so far as to disagree with that portion of Revenue Ruling 66–18 (not discussed above) which held that pruning and shearing expenses should be capitalized.

■ It should also be noted that it has not been contended by the government and it does not appear that any of the pine trees around which brush control procedures were carried out were not well established and growing. If such were the case, then these expenditures would have to be capitalized as being in the nature of planting expenses under Reg. 1.661–3. *See* Revenue Ruling 66–18, C.B.1966–1, 59, 61.

Since the pleadings, depositions and affidavit on file show that there is no genuine issue as to any material fact and that the plaintiff is entitled to judgment on the tree farm expense issue as a matter of law, plaintiff's motion for summary judgment on this issue is granted.