RICHARD C. GOODWIN AND ELAINE GOODWIN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 12561–77     Filed December 29, 1980.

*Robert E. Schlusser,* for the petitioners.
*Stephen E. Sokolic,* for the respondent.

DAWSON, *Judge:* Respondent determined a deficiency in petitioners' Federal income tax for the year 1972 in the amount of $32,640.68.[1] During 1972, Richard C. Goodwin was a partner in two real estate limited partnerships, the Bethlehem Development Co. and D. M. Associates, both of which were formed to construct and operate certain housing projects. Respondent disallowed his distributive share of certain expenses deducted by the partnerships. After concessions by the parties, the only issues remaining for decision are:

(1) Whether certain loan and broker fees paid by the partnerships to arrange financing for the housing projects were incurred in the course of a trade or business under section 162(a);[2] and

(2) Whether certain amounts paid by both partnerships to obtain financing for the housing projects constitute deductible interest under section 163(a) rather than capital expenditures for services rendered.

---

[1]Petitioners and respondent had agreed to an extension of the statutory period of limitations on assessments with respect to the 1972 taxable year pursuant to sec. 6501(c)(4), I.R.C. 1954. Respondent mailed his statutory notice of deficiency prior to the expiration of the extended period.

[2]All section references are to the Internal Revenue Code of 1954, as amended and in effect for the year at issue, unless otherwise indicated.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the attached exhibits are incorporated herein by reference.

Richard C. Goodwin (hereinafter referred to as petitioner) resided in Mount Holly, N.J., and Elaine Goodwin resided in Jenkintown, Pa., when they filed their petition in this case. Their joint Federal income tax return for the calendar year 1972 was filed with the Internal Revenue Service Center in Philadelphia, Pa.

Petitioner has been in the real estate development business for most of his life. During the 1950's, he built single-family homes with his father and brother in southern New Jersey. When his brother left the family business in the early 1960's, petitioner and his father began doing land development work for other builders in the same area. In the late 1960's, they expanded their land development activities to include projects in eastern Pennsylvania. Most of the projects were developed by partnerships in which petitioner and his father were the principal partners. The projects generally involved the planning and construction of residential townhouse and apartment complexes, and were similar in scope to the projects developed by the limited partnerships herein.

For the sake of clarity, the facts pertaining to each of the limited partnerships involved in this case will be summarized separately.

### Bethlehem Development Co.

Bethlehem Development Co. (Bethlehem) was formed by petitioner and his father, Harry J. Goodwin, as a limited partnership under Pennsylvania law. They executed the certificate of limited partnership on April 1, 1972, and it was recorded with the Recorder of Deeds Office, Northampton County, Pa., on June 16, 1972. On July 15, 1972, a limited partnership interest in Bethlehem was conveyed to Berel Altman. Thereafter, petitioner held a 1-percent interest in the partnership as a general partner and a 57.5-percent interest as a limited partner. Bethlehem used the accrual method of accounting in computing its income and losses.

Bethlehem was formed to construct and operate a housing

project in accordance with the provisions of section 236 of the National Housing Act, a program administered by the Department of Housing and Urban Development. The purpose of the section 236 program was to induce the construction of low-cost rental housing. If a project was accepted under section 236, the Federal Housing Administration (FHA) would agree, upon completion of the project, to insure the mortgage loan obtained from a private lender. In addition, the FHA would agree to subsidize the owner's interest obligation so as to limit his interest rate to 1 percent. The owner was required to pass on the reduced interest expense to tenants in the form of lower rents. The owner of the project could also arrange for the Government National Mortgage Association (GNMA) to purchase the mortgage and note from the private lender once the loan had been insured by the FHA.

The Bethlehem project called for construction of 211 townhouses on a 20-acre section of a tract of land purchased in the late the 1960's called the Bethlehem Tract. Petitioner and his father had previously developed two other sections within the Bethlehem Tract, building a total of 225 townhouses over the course of prior years.

On August 31, 1972, the Philadelphia National Bank (PNB) agreed to loan Bethlehem $3,416,400 to fund construction of the Bethlehem Townhouse Apartments project. The mortgage and note which Bethlehem executed in favor of PNB provided for amortization of principal over a period of approximately 40 years beginning February 1, 1974; prior to that date, Bethlehem was liable for accrued interest only. Under the loan agreement, Bethlehem was required to obtain both an FHA insurance commitment and a GNMA purchase commitment with regard to the loan before any funds could be disbursed to the mortgagor. To help arrange the financing and obtain the necessary commitments, Bethlehem had previously enlisted the services of a mortgage brokerage firm, Bogley, Harting, Mahoney & Lebling, Inc. (Bogley). In connection with these matters, Bogley performed the following services:

(1) Analyzed architectural drawings and figures to ensure compliance with FHA requirements;

(2) Prepared and submitted to FHA a feasibility proposal and documentation necessary to obtain a firm commitment;

(3) Negotiated with FHA frequently, regarding such matters

as the number of housing units, architectural feasibility, and mortgage amount; and

(4) Submitted to GNMA certain information which the agency required before it would issue a purchase commitment.

For these services, Bogley charged a fee equal to 0.5 percent of the mortgage loan, or $17,082. The fee was paid by Bethlehem on September 26, 1972, using funds advanced by Goodwin Homes, Inc.

Before issuing its commitment to insure the project upon completion of construction, FHA reviewed the application for economic feasibility by analyzing factors such as ground value, rent levels, cost estimates, and construction budgets. For these services, FHA charged an examination fee equal to 0.3 percent of the loan amount, or $10,249.20. On April 17, 1972, Bogley paid this fee on behalf of Bethlehem, using funds advanced to Bethlehem by Harry J. Goodwin.

On July 21, 1972, after determining the project to be feasible, the FHA issued a commitment to insure the mortgage loan to the extent of $3,416,400. The commitment was conditioned on the payment of an FHA inspection fee equal to 0.5 percent of the loan amount, or $17,082, which was subsequently paid by Bogley on behalf of Bethlehem using funds advanced to Bethlehem by Goodwin Homes, Inc.[3] On July 28, 1972, GNMA issued its commitment to purchase the mortgage, which commitment was to remain effective until July 29, 1974. For the issuance of the commitment, GNMA charged a fee equal to 1 percent of the loan amount, or $34,164. This fee was paid by Bogley on behalf of Bethlehem on July 28, 1972, using funds advanced to Bethlehem by Goodwin Homes, Inc.

As a condition to obtaining the loan, Bethlehem was also required to pay PNB a 1-percent fee, $34,164, as payment for services rendered by the bank in connection with the processing and administration of the loan. These services included the following:

(1) Review of the economic feasibility of the project, including an analysis of financial statements, credit reports, and cost breakdowns;

---

[3]This fee was not reported as a deduction on Bethlehem's 1972 Federal income tax return and consequently was not included in petitioner's ratable share of the partnership net loss. Thus, its deductibility is not at issue in this case.

(2) Analysis of title report;

(3) Preparation and presentation of report for the PNB loan committee;

(4) Preparation of loan documents;

(5) Processing the contractor's monthly requisitions for loan advances;

(6) Inspection of the project during construction by PNB inspectors and outside inspectors; and

(7) Preparation of documents necessary to obtain the FHA insurance endorsement and to effect the transfer of the mortgage and note to GNMA upon completion of the project.

Bethlehem paid $5,000 of the $34,164 fee on December 28, 1972. The balance was paid in 1973. The fee was intended to cover the costs of services generally performed by the bank on such loans and was not tied to the specific costs incurred by it in connection with the Bethlehem loan. No portion of the fee represented compensation for the use of money.

Construction of the housing project was commenced in October 1972 and was not completed until the fall of 1973. Consequently, no tenants occupied the project, and Bethlehem received no income during 1972. On July 31, 1974, GNMA purchased the mortgage and note from PNB.

On its 1972 Federal income tax return, Bethlehem reported a net loss of $70,346, comprised of the following deductions:

| | |
|---|---|
| Interest on PNB mortgage | $1,773 |
| Accounting fees | 1,470 |
| Insurance | 608 |
| FHA examination fee | 10,249 |
| Bogley broker fee | 17,082 |
| PNB loan fee | 5,000 |
| GNMA commitment fee | 34,164 |
| | 70,346 |

Petitioner's ratable share of the net loss amounted to $40,801. In his statutory notice, respondent disallowed all but $4,642 of the partnership loss, thus reducing petitioner's share to $2,692.[4] The

---

[4] According to the statutory notice, the details of the adjustments which respondent made to the losses reported by Bethlehem and D. M. Associates are contained in the Revenue agent's report dated May 14, 1976. That report was not introduced into evidence in this case. Thus, it is uncertain which deductions respondent allowed in arriving at the adjusted net loss of $4,642.

parties disagree on the deductibility of the FHA examination fee, the Bogley broker fee, the PNB loan fee, and the GNMA commitment fee.

## D. M. Associates

D. M. Associates is a New Jersey limited partnership formed to construct and operate a housing project known as section 61, Ramblewood Village (Ramblewood 61). Its certificate of limited partnership was executed by the partners on September 15, 1972, and recorded with the clerk's office of Burlington County in Mt. Holly, N.J., on November 27, 1972. During 1972, petitioner held a 58½-percent interest in the partnership as a general partner. D. M. Associates used the accrual method of accounting in computing its income and losses.

Ramblewood 61 was contiguous to two previous housing projects built by petitioner and his father. Collectively, these three projects, which were similar in design and layout, were known as Ramblewood Village.

On January 11, 1972, petitioner executed a letter agreement wherein he retained the services of Buchbinder-Shapiro & Associates, Inc. (Buchbinder), to obtain both construction and permanent financing commitments for the Ramblewood 61 project. Under the agreement, petitioner was obligated to pay a fee equal to 1 percent of the mortgage loan, or $35,000, if Buchbinder was successful in obtaining a 30-year permanent mortgage at 8¼-percent interest. The agreement also provided for the payment of an additional $8,750 if Buchbinder was able to obtain a construction loan from the same lender at 8¼ percent. On February 2, 1972, Peoples Trust of New Jersey (Peoples) agreed to provide both construction and permanent financing for the project and signed a commitment to loan $3,500,000 at 8¼-percent interest. The loan agreement provided for a construction period of 15 months, during which the mortgagor was liable only for accrued interest; thereafter, the principal was to be amortized in monthly installments over a period of 30 years.

The loan commitment was originally issued to HJG Corp., a company formed by petitioner and his father several years prior to 1972 for the sole purpose of accepting mortgage commitments for future housing projects in situations where a formal partnership agreement between the project investors had not

yet been drawn up. By holding the commitment temporarily in the name of HJG Corp., which had no other assets, petitioner hoped to limit his personal liability with respect to any obligations for commitment fees charged by the lender. On November 29, 1972, Peoples agreed to an assignment of the loan commitment from HJG Corp. to D. M. Associates.

On December 11, 1972, D. M. Associates closed on the loan with Peoples and paid $38,750 of the mortgage proceeds to Buchbinder as a final payment on the broker's fee of $43,750. $5,000 of the broker's fee had been previously paid to Buchbinder when the loan commitment was issued. The broker's fee was for services rendered in arranging financing for the housing project.

Petitioner made two $35,000 payments to Peoples in connection with the loan. On December 21, 1971, he paid $35,000, 1 percent of the loan amount, as a nonrefundable loan fee to cover expenses associated with the following services performed by Peoples in conjunction with the processing of the loan application:

(1) Inspection of the property to be mortgaged;

(2) Review of the plans and specifications for the housing project;

(3) Analysis of the mortgagor's financial statements and his overall credit standing; and

(4) Overall appraisal of the economic feasibility of the project based on an analysis of such factors as rent levels, location of the project, and the type of units to be built.

The loan fee was intended to cover the costs of services generally performed by the bank on such loans and was not tied to the specific costs incurred by it in connection with the D. M. Associates loan. No portion of the loan fee represented compensation for the use of money. On February 7, 1972, petitioner paid an additional $35,000 to Peoples as a good-faith deposit to ensure that he would in fact utilize the loan commitment. The deposit was refunded to D. M. Associates when the loan was closed on December 11, 1972.

The loan fee was paid by petitioner prior to the execution of the written partnership agreement. After the execution of the partnership agreement, the loan commitment was assigned to D. M. Associates. At that time, the loan fee became an asset of the partnership, and a corresponding liability to petitioner for the

amount of the fee was created. Petitioner did not deduct any portion of the loan fee on his 1972 Federal income tax return except to the extent that it was reflected in his ratable share of the partnership net loss for 1972.

Ramblewood 61 was not completed or occupied by tenants until after 1972. D. M. Associates received no income during 1972.

On its 1972 Federal income tax return, D. M. Associates reported a net loss of $82,981, comprised of the following deductions:

| | |
|---|---|
| Interest paid to Peoples ..................... | $3,117 |
| Insurance ........................................ | 1,114 |
| Peoples loan fee ............................... | 35,000 |
| Buchbinder broker fee ....................... | 43,750 |
| | 82,981 |

Petitioner's ratable share of the net loss amounted to $48,544. In his statutory notice, respondent disallowed all but $13,176 of the partnership loss, thus reducing petitioner's share to $7,707.96.[5] Respondent has allowed a deduction for the Buchbinder broker fee to the extent of $8,750. The parties disagree on the deductibility of the balance of the broker fee, or $35,000, and the Peoples loan fee.

### OPINION

The issues in this case concern the deductibility of certain loan fees and broker fees paid by Bethlehem and D. M. Associates to obtain financing for the construction of housing projects.

### Issue 1. Carrying on a Trade or Business

The first issue we will consider is whether these fees, to the extent they were included in petitioner's share of the partnership losses deducted on his 1972 Federal income tax return, can be said to have been incurred in the course of a trade or business under section 162(a).[6]

---

[5] See note 4 supra.

[6] Petitioner has not argued the applicability of sec. 212 in this case and therefore we do not decide whether the deductions would have been allowable under that provision. See sec. 702(a)(7); sec. 1.702–1(a)(8)(i), Income Tax Regs.

Section 162(a) allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year "in carrying on any trade or business." This phrase has been held to deny current deductions for startup or preopening costs incurred by taxpayers prior to the beginning of actual business operations. *Richmond Television Corp. v. United States*, 345 F.2d 901 (4th Cir. 1965), vacated and remanded on other issues 382 U.S. 68 (1965); *Madison Gas & Electric Co. v. Commissioner*, 72 T.C. 521, 566–567 (1979), affd. 633 F.2d 512 (7th Cir. 1980); *Radio Station WBIR, Inc. v. Commissioner*, 31 T.C. 803, 810–812 (1959); *Polachek v. Commissioner*, 22 T.C. 858 (1954).[7] In *Madison Gas & Electric Co. v. Commissioner, supra,* we dealt with this issue in a factual setting quite similar to the present case. That case concerned three power companies which formed a joint venture for the purpose of constructing and operating a nuclear power plant. The issue was whether one of the partners could deduct its share of certain employee training expenses incurred during the construction of the plant but prior to the issuance of an operating permit by the Nuclear Regulatory Commission. We held that the joint venture was not engaged in a trade or business until actual business operations commenced and refused to allow current deductions for expenses incurred during the construction phase. Based on our holding in *Madison Gas*, we think it clear that neither Bethlehem nor D. M. Associates was carrying on a trade or business during 1972, since the housing projects were not completed or occupied by tenants until some time after that year.[8]

---

[7]See also *Francis v. Commissioner*, T.C. Memo. 1977–170, where we held that the construction of an apartment complex did not constitute the carrying on of a trade or business; *Swigart v. Commissioner*, T.C. Memo. 1980–379; *Kennedy v. Commissioner*, T.C. Memo. 1973–15.

[8]We note that in *United States v. Manor Care, Inc.*, 490 F. Supp. 355 (D. Md. 1980), the Federal District Court allowed deductions for certain expenses incurred by nursing homes prior to the beginning of actual operations. The expenses were in the nature of normal, recurring, operating expenses such as wages, utilities, and advertising. The District Court determined that none of the expenses could be expected to provide benefits to the nursing homes beyond the taxable year in question. For this reason, and because the expenses were incurred in the same year in which the nursing homes received their licenses and commenced business operations, the expenses were held to be currently deductible under sec. 162(a).

While the result reached in *Manor Care* may be appropriate, we have reservations about the correctness of the analysis employed. By adopting a broad-facts-and-circumstances test for deductibility, the District Court tended to obscure the fact that sec. 162(a) imposes two distinct requirements which expenses must satisfy in order to be currently deductible. First, they must be incurred by a taxpayer while carrying on a trade or business. Second, they must be ordinary

Petitioner, however, does not contend that the partnerships were engaged in trades or businesses while the housing projects were under construction. Rather, he would have us disregard the partnership entities and apply the trade or business test at the level of the individual partners under the so-called "aggregate theory" of partnership taxation. Applying the test in this fashion, petitioner argues that (1) his prior activities in the real estate development business constituted an ongoing trade or business, and (2) his activities as a partner in Bethlehem and D. M. Associates represented nothing more than an expansion or continuation of that trade or business. Thus, petitioner claims that the expenses reported by the partnerships and deducted by him were not, as respondent contends, nondeductible startup costs associated with the formation of a new trade or business, but rather, ordinary and necessary expenses incurred in connection with the operation of an existing trade or business. We agree with respondent.

We addressed arguments similar to those raised by petitioner in *Madison Gas & Electric Co. v. Commissioner, supra.* In that case, the taxpayer, in addition to arguing that the partnership was carrying on a trade or business during construction of the nuclear facility, also maintained that the activities of the partnership should be regarded as an extension of the separate businesses of the constituent partners, all of which were power companies. Thus, the taxpayer argued, the construction-period expenses were incurred in connection with the expansion of existing trades or businesses and were currently deductible as ordinary and necessary expenses under section 162. We rejected that argument, principally because we felt it was inconsistent with the concept of the partnership as a substantive economic entity clearly distinct from the separate businesses of its

---

and necessary. It is generally held that the "ordinary" requirement precludes current deduction of capital expenditures which produce assets with useful lives lasting beyond the year of acquisition. See, e.g., *Commissioner v. Lincoln Savings & Loan Association,* 403 U.S. 345 (1971); *Commissioner v. Tellier,* 383 U.S. 687 (1966); *Cagle v. Commissioner,* 539 F.2d 409 (5th Cir. 1976); *Briarcliff Candy Corp. v. Commissioner,* 475 F.2d 775 (2d Cir. 1973). We think the expenses in *Manor Care* were clearly preoperating in nature. However, to the extent the expenditures created assets with determinable useful lives benefiting taxable years following the start of business operations, such amounts would be deductible during those years in the form of amortization deductions, irrespective of when they were paid. See sec. 1.461–1(a)(1) and (2), sec. 1.167(a)–1, sec. 1.167(a)–3, Income Tax Regs.

partners. Accordingly, we held that the trade or business test must be applied at the partnership level without regard to the businesses of the corporate partners.[9] 72 T.C. at 564–565.

Our decision on this issue was affirmed by the Court of Appeals for the Seventh Circuit, which stated the following (633 F.2d at 517):

On the ultimate issue in this case, the Tax Court held that the claimed expenses were incurred as pre-operational costs of the partnership venture and therefore under settled law were non-deductible capital expenditures. See *Richmond Television Corp. v. United States*, 345 F.2d 901 (4th Cir. 1965), vacated on other grounds, 382 U.S. 68. * * * MGE argues that this holding elevates form over substance in that even if the operating arrangement is technically a tax partnership, the claimed expenses were in actuality simply ordinary and necessary expenses of expanding its existing business. MGE asks us therefore to ignore the partnership entity as lacking economic substance.

In support of its position, MGE relies heavily on First National Bank of South Carolina v. United States, 558 F.2d [721] (4th Cir. 1977); First Security Bank of Idaho N.A. v. Commissioner, 63 T.C. 644 (1975); and Colorado Springs National Bank v. United States, 505 F.2d 1185 (10th Cir. 1974). In those cases, the respective courts held that the initial costs incurred by banks participating in non-profit associations set up as clearinghouses for a credit card system were deductible as ordinary and necessary business expenses because participation in a credit card system was not a new business venture but merely a new way of conducting an old business. These cases are not on point. Participation in the credit card associations had no extrinsic or marketable value, created no property right and did not entitle the participants to any distribution of profits, either cash or in-kind. There was no suggestion in those cases whatsoever that the banks had by participating in the association created a new partnership venture with other banks, and the courts were not asked to ignore partnership status. The question was whether the costs were necessary and ordinary current expenses or capital investments in future economic benefits.

Here MGE, WPS and WPL are engaged in the joint production of electricity for resale, a joint venture for profit. Because they were each already in the business of selling electricity, it can, of course, be argued that the partnership venture itself is an extension or expansion of their existing businesses. It does not follow from this though that we should ignore the partnership as lacking economic substance. Such reasoning would lead to the absurd conclusion that any partnership established to do collectively what its participants formerly did individually or continue to do individually outside the partnership lacks economic substance and should not be treated as a partnership for tax purposes.

At bottom, MGE's position is that it is not sound policy to treat the entity

---

[9]We reject here, as we did in *Madison Gas*, any notion that the partnerships are sham entities without real economic substance.

here as a partnership. But we are not free to rewrite the tax laws, whatever the merits of MGE's position. Under the Internal Revenue Code the joint venture here is a partnership and the expenses were nondeductible, pre-operational start-up costs of the partnership venture. * * *

Petitioner contends that *Madison Gas* was decided incorrectly and offers a variety of arguments to support his position. His basic premise is that a partnership is not a "taxpayer" within the meaning of section 162(a) since under the sections 701 and 702 it is the partners, rather than the partnerships, who are required to pay taxes on its income. However, we are not inclined to give section 162 such a literal construction.

In *Podell v. Commissioner*, 55 T.C. 429 (1970), we held that the reference to the trade or business of the "taxpayer" in section 1221(1) "clearly refers to the trade or business of the partnership, despite the fact that under section 701 partnerships are not subject to income tax." 55 T.C. at 433. Thus, we held that the intent of the partnership, rather than the intent of any specific partner, determined whether certain sales of real estate were made in the ordinary course of business and were therefore ineligible for capital gain treatment. Our decision was based on section 702(b), which provides the method for determining the character of a partner's distributive share of income or loss:

The character of any item of income, gain, loss, deduction, or credit included in a partner's distributive share under paragraphs (1) through (8) of subsection (a) shall be determined as if such item were realized directly from the source from which realized by the partnership, or incurred in the same manner as incurred by the partnership.

Contrary to petitioner's assertion on brief, this provision has been held to require that the character of the items comprising the partnership income or loss be determined at the partnership level. *Davis v. Commissioner*, 74 T.C. 881, 905–906 (1980); *Miller v. Commissioner*, 70 T.C. 448, 455–456 (1978); *Podell v. Commissioner*, 55 T.C. 429, 432–434 (1970); *Grove v. Commissioner*, 54 T.C. 799, 803–805 (1970); *Barham v. United States*, 301 F. Supp. 43, 44–47 (M.D. Ga. 1969), affd. per curiam 429 F.2d 40 (5th Cir. 1970); see also sec. 1.702–1(b), Income Tax Regs. Moreover, the opinion of the Supreme Court in *United States v. Basye*, 410 U.S. 441 (1973), upon which petitioner relies, is entirely consistent

with our holding herein, as indicated by the following excerpt (410 U.S. at 448): [10]

Thus, while the partnership itself pays no taxes, 26 U.S.C. sec. 701, it must report the income it generates and such income must be calculated in largely the same manner as an individual computes his personal income. *For this purpose, then, the partnership is regarded as an independently recognizable entity apart from the aggregate of its partners.* Once its income is ascertained and reported, its existence may be disregarded since each partner must pay a tax on a portion of the total income as if the partnership were merely an agent or conduit through which the income passed. [Emphasis added.]

Accordingly, we hold that in the context of section 162, the character of the deductions, i.e., whether they were incurred in the course of a trade or business, must be resolved at the partnership level.

Other cases cited by petitioner are inapposite. In *York v. Commissioner*, 261 F.2d 421 (4th Cir. 1958), the issue was whether the taxpayer, an individual who had previously engaged in the business of developing commercial real estate, could deduct an expenditure relating to an industrial real estate project which he was considering. The Fourth Circuit allowed the deduction because there was not a sufficient difference between industrial and commercial real estate development to justify the conclusion that the taxpayer had embarked upon a new trade or business. However, unlike the present case, the expenses related to the industrial project were not incurred by a separate entity formed specifically to develop the project. *Malmstedt v. Commissioner*, 578 F.2d 520 (4th Cir. 1978), is similarly distinguishable. The issue in that case required the court to decide whether a hotel business venture undertaken by a partnership constituted a new trade or business, given the fact that the partnership had previously been involved in the business of developing residential real estate. As in *York*, the court was not faced with the question of whether the trade or business of a partner was an appropriate consideration in characterizing the activities of the partnership for purposes of section 162.

---

[10]We relied on *Basye* in *Resnik v. Commissioner*, 66 T.C. 74 (1976), affd. per curiam 555 F.2d 634 (7th Cir. 1977), where we held that, in order to determine whether a prepaid interest deduction by a partnership created a distortion of income, sec. 446(b) must initially be applied at the partnership level rather than the partner level. Accord, *Van Raden v. Commissioner*, 71 T.C. 1083 (1979), on appeal (9th Cir., Sept. 18, 1979).

Also distinguishable are *Butler v. Commissioner*, 36 T.C. 1097 (1961); *Ward v. Commissioner*, 20 T.C. 332 (1953), affd. 224 F.2d 547 (9th Cir. 1955); *Flood v. United States*, 133 F.2d 173 (1st Cir. 1943). Each of these cases stands for the proposition that a taxpayer may be individually engaged in a trade or business by reason of his participation in a partnership. Thus, under appropriate circumstances, a partner may be able to deduct as an ordinary and necessary business expense an amount paid by him on behalf of the partnership for which he was not reimbursed. However, these cases in no way support petitioner's contention that the business activities of an individual who later becomes a partner have a bearing on whether his distributive share of partnership deductions were incurred in the course of a trade or business.

Finally, petitioner contends that our holding in *Madison Gas* conflicts with our opinion in *Snow v. Commissioner*, 58 T.C. 585 (1972), affd. 482 F.2d 1029 (6th Cir. 1973), revd. 416 U.S. 500 (1974). In that case, the taxpayer invested $10,000 in Burns Investment Co., a partnership formed to develop and market a trash-burning device. He had previously invested in two other partnerships which were also engaged in research and development work on new products. Respondent disallowed a deduction for the taxpayer's distributive share of the expenses of Burns Investment Co. on the ground that such expenses were not incurred "in connection with his trade or business" under section 174(a)(1). This Court framed the issues in the case by stating that the expenses would be deductible if they were incurred in (1) the trade or business of the taxpayer, or (2) the trade or business of Burns Investment Co. We held against the taxpayer on both grounds, and with regard to the first issue, we stated that his collective participation in the three partnerships was insufficient to place him in an individual trade or business of developing new products. The Court of Appeals for the Sixth Circuit agreed with our statement of the issues and affirmed. The Supreme Court subsequently reversed on the basis that Congress intended section 174 to be interpreted in a liberal fashion to encourage research and experimentation by small business. The Court did not address the question of whether the taxpayer was individually engaged in a trade or business, or, if so, whether the partnership expenses were deductible in the course of that business.

We recognize that the opinions of this Court and the Sixth Circuit in *Snow* raise the possibility that partnership deductions may satisfy the trade or business requirement at the partner level regardless of whether the partnership itself is engaged in a trade or business. However, because we held that neither the partnership nor the taxpayer was engaged in a trade or business, we never reached the question of whether the partnership expenses could be deemed to have been incurred in the course of the taxpayer's individual trade or business. Nor did the Supreme Court address the issue in its reversal. Thus, any references in the *Snow* opinion to partner-level characterization of partnership expenses must be considered dicta which has been rejected by our decision in *Madison Gas.*

Based on the foregoing, we hold that Bethlehem and D. M. Associates were not engaged in a trade or business during 1972, and petitioner is not entitled to deduct any of the contested expenses under section 162(a).

## Issue 2. Loan Fees

The next issue for our consideration is whether certain loan fees paid to banks may be deducted by the partnerships as interest under section 163(a), which lacks the trade or business requirement contained in section 162. The fees at issue are (1) the $34,164 PNB loan fee, $5,000 of which was paid and deducted by Bethlehem during 1972, and (2) the $35,000 Peoples loan fee, which was paid by petitioner on December 21, 1971, in connection with a loan eventually made to D. M. Associates on December 11, 1972.

As a preliminary matter, we must decide whether D. M. Associates is precluded from deducting any portion of the Peoples fee by reason of the fact that petitioner paid the fee prior to the execution of the written partnership agreement. Petitioner paid the fee on December 21, 1971, whereas the partnership agreement was not executed until September 15, 1972. Thus, respondent maintains that D. M. Associates improperly deducted an expense incurred by another taxpayer. Petitioner insists that he paid the loan fee on behalf of D. M. Associates pursuant to an oral partnership agreement which preceded the written agreement. Since the payment was in the nature of a loan to the partnership, petitioner contends that the

partnership is entitled to any deduction otherwise allowable with respect to such amount.

In our view, the record contains insufficient evidence to prove that an oral partnership agreement was in effect at the time the loan fee was paid. However, this does not necessarily foreclose a deduction for the amount by D. M. Associates. Petitioner testified that he frequently advanced funds in order to arrange financing for anticipated development projects and that such advances were treated as loans on the books of the entity which ultimately assumed responsibility for the project. We have no reason to doubt that a similar loan was created upon the assignment of the Peoples loan commitment to D. M. Associates in November 1972.[11] Thus, from the standpoint of the partnership, the deductibility of the loan fee must be evaluated in the context of a purchased asset with a useful life equal to the duration of the mortgage loan.

We next turn to the question of whether the Peoples and PNB loan fees may be deducted by the partnerships as interest under section 163(a).[12] Section 163(a) allows a deduction for "interest paid or accrued within the taxable year on indebtedness." Interest is generally defined for Federal income tax purposes as "compensation for the use or forebearance of money." *Deputy v. du Pont*, 308 U.S. 488, 498 (1940); *Wilkerson v. Commissioner*, 70 T.C. 240, 253 (1978), on appeal (9th Cir., Oct. 1, 1979). In determining whether a particular payment constitutes interest, the facts, not the terminology, control the nature of the payment. *Wilkerson v. Commissioner, supra; L-R Heat Treating Co. v. Commissioner*, 28 T.C. 894, 897 (1957). Payments for services performed by a lender in connection with a loan do not

---

[11]Although petitioner did not corroborate his testimony by placing the books of the partnership in evidence, we think it unrealistic to assume that his substantial investment in the loan commitment went unrecognized at the time of transfer.

[12]Because we have concluded that the Peoples loan fee must be treated as an asset of the partnership purchased from petitioner, the question arises whether the amount could be deducted by the partnership as interest paid "on indebtedness" under sec. 163(a). Furthermore, assuming the Peoples and PNB loan fees qualify as interest under that provision, we seriously doubt whether such amounts could be fully deducted in the year of payment by the accrual method partnerships herein. See generally *Lay v. Commissioner*, 69 T.C. 421, 432–435 (1977); *James Brothers Coal Co. v. Commissioner*, 41 T.C. 917 (1964); *Planned Communities, Inc. v. Commissioner*, T.C. Memo 1980–555; secs. 461(a) and 446(b); cf. *Baird v. Commissioner*, 68 T.C. 115 (1977).

It is unnecessary to address these matters since we have determined that the Peoples and PNB loan fees were charges for services rather than interest.

constitute compensation for the use or forebearance of money, but rather are capital expenditures which must be amortized over the life of the loan. *Wilkerson v. Commissioner, supra* at 253–257; *Lay v. Commissioner,* 69 T.C. 421, 437–440 (1977); *Cagle v. Commissioner,* 63 T.C. 86, 97–98 (1974), affd. 539 F.2d 409 (5th Cir. 1976); *Enoch v. Commissioner,* 57 T.C. 781, 794–795 (1972); *Lovejoy v. Commissioner,* 18 B.T.A. 1179 (1930).

As indicated by the findings of fact herein, both the PNB and Peoples loan fees were charged in order to defray expenses incurred by the banks in connection with the processing and administration of the loans. These expenses were attributable to such services as the analysis of the economic feasibility of the project, inspections of the property before and during construction, credit appraisals, and the processing of loan disbursements during the construction period. Although the amount of each fee was computed as a percentage of the loan amount and bore no direct relation to the actual costs of the specific services performed, representatives from both banks testified that the fees were intended to cover the costs generally incurred in the processing of such loans, and that no portion of the fees represented interest.

Petitioner, who bears the burden of proof on this issue, has produced no evidence which would tend to contradict the testimony of the bank officials. Thus, this case is easily distinguishable from *Wilkerson v. Commissioner, supra,* where the taxpayer presented expert testimony to show that a substantial portion of the 2-percent financing fee charged by the lender was in fact intended to increase the effective interest yield on the loan. 70 T.C. at 254–256. In lieu of such evidence, petitioner asks us to draw a distinction between charges for services performed by the lender which provide a direct benefit to the borrower and those which are part of the lender's internal operations and provide no direct benefit. Under petitioner's argument, the former are capital expenditures required to be amortized over the life of the loan, whereas the latter are in the nature of additional interest deductible under section 163. We reject this argument. In our view, it is irrelevant whether the borrower derives any "direct benefit" from the services performed, for, in either case, the ultimate benefit which the borrower recieves is the loan itself. The fact remains that charges for services performed by the bank in connection with a

loan do not represent compensation for the use of the funds advanced.

Accordingly, we hold that the fees paid to PNB and Peoples were charges for services which must be capitalized and amortized over the lives of the loans to which they relate.[13] However, in view of our holding that the partnerships were not engaged in a trade or business during 1972, no amortization deductions shall be allowed for such year in excess of any amounts previously allowed by respondent.[14]

To give effect to concessions by the parties and to our conclusions on the disputed issues,

*Decision will be entered under Rule 155.*

---

[13]Our decisions on the foregoing issues make it unnecessary to consider the following issues also raised by petitioner:

(1) Whether the Buchbinder broker fee paid by D. M. Associates, which petitioner concedes is a capital expenditure, should be apportioned between the "construction" and "permanent" financing periods in order to determine the appropriate period for amortization;

(2) Whether the PNB loan fee paid by Bethlehem should be amortized over the term of the mortgage note or the shorter period ending with the purchase of the note by GNMA; and

(3) Whether the FHA examination fee, the GNMA commitment fee, and Bogley broker fee paid by Bethlehem constitute ordinary and necessary expenses under sec. 162 rather than capital expenditures required to be amortized over the life of the loan.

To a large extent, these issues are rendered moot by our holding that construction of the housing projects does not, by itself, constitute trade or business activity under sec. 162(a). In any event, we note with regard to the first two issues that this Court has previously indicated that the assignment of the note and mortgage to a permanent or secondary lender following the completion of construction does not create two distinct loans for amortization purposes. See *Wilkerson v. Commissioner,* 70 T.C. 240, 261–263 (1978), on appeal (9th Cir., Oct. 1, 1979); *Lay v. Commissioner,* 69 T.C. 421, 435–436 (1977). Moreover, in the case of D. M. Associates, the construction and permanent financing were provided by the same lender and evidenced by a single note, factors which would seem to preclude bifurcation of the loan period for purposes of allocating the Buchbinder broker fee.

[14]Finally, we note that sec. 102 of the Miscellaneous Revenue Act of 1980, Pub. L. 96–605, 94 Stat. 3521, provides the taxpayer with an election to amortize startup expenditures over a period of not less than 60 months if (1) the amounts are paid or incurred in connection with (A) the investigation of the creation or acquisition of an active trade or business, or (B) the creation of an active trade or business; and (2) the amounts would have otherwise been allowable as deductions for the taxable year in which paid or incurred had they arisen in connection with the expansion of an existing trade or business in the same field as the new trade or business. Thus, the new law, which applies only to amounts paid or incurred after July 29, 1980, would apparently allow amortization deductions for such preopening costs as advertising, employee training, and expenses incurred in securing distributors, suppliers, or potential customers, even though the periods benefited by such expenditures may be indeterminate. See S. Rept. 96–1036, to accompany H.R. 7956, Pub. L. 96–605 (1980).