METROPOLITAN MORTGAGE FUND, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

THE FITTON COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 299-70, 300-70. Filed April 30, 1974.

---

[10] Cf. Rev. Rul. 58-162, 1958-1 C.B. 234; Rev. Rul. 70-294, 1970-1 C.B. 13.

*Wallace E. Whitmore, Louis H. Mann,* and *W. Stephen McConnell,* for the petitioners.

*Randolph D. Mason,* for the respondent.

GOFFE, *Judge:* The Commissioner determined the following deficiencies in Federal income tax of petitioners:

| Petitioner | Docket No. | TYE | Deficiency |
|---|---|---|---|
| Metropolitan Mtg. Fund | 299-70 | 11/30/66 | $30,448.41 |
| The Fitton Co. | 300-70 | 11/30/67 | 800.28 |

The Fitton Co. is a petitioner by reason of being the parent of Metropolitan Mortgage Fund during the taxable year ended November 30, 1967, for which a consolidated Federal income tax return was filed. The sole issue to be decided results only from adjustments to the income of Metropolitan Mortgage Fund; therefore, it will hereinafter be referred to as petitioner.

The issue presented for decision is the taxability of a 1-percent charge petitioner makes to purchasers of single-family dwellings when petitioner arranges a conventional, VA, or FHA loan. The issue is primarily one of fact. Does the 1-percent charge represent a fee for arranging the loan or is it, instead, interest not reflected in the rate of interest expressed in the resulting promissory note?

FINDINGS OF FACT

Some of the facts are stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated by reference.

Metropolitan Mortgage Fund, Inc. (Metropolitan), is a corporation organized under the laws of Virginia and engaged in the mortgage banking business in the Washington, D.C., metropolitan area with its principal office located in Alexandria, Va. The Fitton Co. (Fitton) acquired all of the stock of Metropolitan in 1967. A Federal corporate income tax return was filed by Metropolitan for the taxable year ended on November 30, 1966, with the district director of internal revenue at Richmond, Va. A consolidated Federal income tax return for the taxable year ended November 30, 1967, was filed by the Fitton Co. and Metropolitan, its subsidiary, with the district director of internal revenue at Richmond, Va.

Petitioner is a mortgage banking firm. Its business activities during the periods in question included: (1) Mortgage administration or servicing of mortgages for permanent investors; (2) commercial brokerage; and (3) origination of residential mortgage loans through its own funds with the intention of reselling such mortgages to permanent investors.

Petitioner's gross income and the sources of such income for the taxable years involved were as follows:

|  | 11/30/66 | 11/30/67 |
|---|---|---|
| Loan commissions—mortgages | $189, 206. 82 | $135, 476. 70 |
| Loan commissions—commercial | 74, 268. 00 | 45, 885. 00 |
| Servicing fees | 173, 464. 16 | 173, 976. 77 |
| Interest income on mortgages—net | 22, 330. 91 | 9, 595. 28 |
| Late charges | 7, 731. 86 | 9, 520. 11 |
| Assumption fees | 4, 159. 00 | 6, 525. 00 |
| Inspection fees | 17, 300. 00 | 12, 584. 00 |
| Miscellaneous | 137. 71 | (466. 86) |
| Total gross income | 488, 598. 46 | 393, 096. 00 |

Mortgages which petitioner serviced included mortgages which it originated, those acquired from lending institutions and subsequently resold, and mortgages which petitioner had neither originated nor acquired. Petitioner's mortgage servicing entailed various accounting functions such as the collection of mortgage payments, the payment of real estate taxes, and the responsibility for ensuring that the properties were insured and that Federal regulations were being complied with. The services were only performed under contractual arrangements with permanent investors.

Metropolitan's brokerage business involved bringing together a borrower and a lender for commercial loans for construction of shopping centers, office buildings, apartment houses, and similar income-producing properties. Petitioner made an appraisal of the property involved and submitted such information to a prospective lender. Upon obtaining a mutual agreement between the parties, the lender's conditions for closing were transmitted directly to a "closing attorney" or through petitioner, and the loan proceeds were disbursed by the "closing attorney." Petitioner's fees for arranging such a loan, a transaction in which no liability on its part was incurred, averaged 1 percent of the amount of the loan, which was received at the closing. In its income tax returns for the years in question, petitioner included such fees in its income at the time of the closing of each loan.

The mortgage loans, originated by petitioner during the taxable years before us, were made only for purchases of single-family dwellings. Metropolitan originated conventional, Government-insured, and

Government-guaranteed loans and its conventional loans comprised approximately 10 percent of the loans it originated. Conventional loans are sometimes insured by private corporations and the other loans are guaranteed by the Veterans' Administration (VA) or insured by the Federal Housing Administration (FHA). In originating Government-insured and -guaranteed loans, petitioner operated under franchises from the VA and FHA and was directly subject to the regulations of these agencies. The operating costs incurred by the petitioner in originating the loans were deducted by it on its income tax returns as such expenses were incurred.

An oral loan commitment was made by petitioner to each prospective borrower at a specific interest rate subject to certain conditions imposed by the FHA and VA. FHA and VA regulations provided that lending institutions such as petitioner were permitted to charge borrowers a maximum of 1 percent of the principal amount of the loan as an expense of originating the mortgage. The maximum stated interest rate to borrowers was determined by the Secretary of the Department of Housing and Urban Development (HUD) as authorized by statute. The mortgage origination fee, also referred to as a "loan commission," "loan placement fee," a "loan service fee," and a "loan processing fee," was not refundable.

Metropolitan had outstanding written commitments with several large permanent investors, which included savings and loan institutions, mutual savings banks, and life insurance companies, to purchase a specified total dollar amount of mortgage loans during the periods in issue. Approximately one-half of the loans originated by petitioner during the periods before us were committed for sale to permanent investors at the time of origination. The commitments specified certain conditions of acceptance including, among other things, the following: a designated minimum interest rate, maturity date, amount, purchase price expressed as a certain percentage of the par value of the loan plus accrued interest, limitations on the location of the mortgaged property, and, frequently, a provision for a commitment fee or origination fee to be paid by petitioner to the permanent investor. The commitments were usually limited to 60 to 90 days' duration at which time the notes and mortgages could be delivered. The price obtained by petitioner for the notes and mortgages at the particular discount from their face value was a negotiated one based upon the prevailing money market. Some of petitioner's commitments from permanent investors provided for the payment of a penalty in the event of nondelivery of the agreed amount of mortgages, but

Metropolitan was not required to supply or sell any notes and mortgages pursuant to the commitments.

Petitioner originated mortgage loans with funds obtained from its own capital and from short-term notes obtained by pledging its mortgages as collateral security at local banks. The banks would lend Metropolitan a percentage of the aggregate face amount of the mortgages based upon what was deemed to be their market value. Petitioner was able to borrow more money on mortgages which had been specifically committed to a permanent investor than on other mortgages. In times of rising interest rates, mortgages with fixed interest rates usually decline in value; therefore, the banks would require repayment or renegotiation of the notes.

Prior to the origination of an FHA-insured or VA-guaranteed mortgage, petitioner was required to initiate certain paperwork. On each prospective FHA loan, it was necessary for petitioner to file the following applications with the Government agency: (a) Form 2800, or application for a property appraisal and insurance commitment; and (b) form 2900, which included a mortgagee's application for approval of the mortgagor, a credit analysis on the buyer composed of a verification of his bank deposits and employment, and an application for a firm commitment for mortgage insurance under the National Housing Act. On each prospective VA loan, the petitioner was required to obtain a credit report on the purchaser, a verification of the borrower's income and employment, a copy of the executed sales contract, and a certificate of the veteran's eligibility, all of which were attached to the application for the home loan guarantee. Although not required to do so in most cases, petitioner filed a request for a determination of the reasonable value of the property with 60 percent of its VA mortgages. Amounts charged the purchaser for the VA or FHA credit reports represented the actual cost of the report incurred by petitioner with a credit bureau.

Prior to submission of the VA or FHA applications, petitioner was required to make an independent determination as to whether the prospective borrower met the FHA or VA requirements. Subsequent to the submission of the application, petitioner would sometimes be required to supply the VA or FHA with additional information about the borrower.

Prior to the closing of the loans, closing instructions were sent to the attorney handling the closing setting forth petitioner's requirements for closing the loan and requesting that certain documents be mailed to petitioner's office after closing. The "closing attorney" prepared all the legal documents, including the note and mortgage, and was paid for his services by both the buyer and the seller in accordance

with accepted standards of the legal profession. The closing instructions provide in part that:

When these papers are in our hands, we will issue our loan check in the amount of the loan less the following charges, *which are to be collected for our account* [emphasis added] at settlement:

Funding Fee to be paid by purchaser_____ $_____
Lender's Inspection fee to be paid by seller_____ _____
Origination fee to be paid by purchaser_____ _____
Discount fee to be paid by seller_____ _____
Hazard Insurance Premium_____ _____
Insurance Escrow_____ _____
Credit Report_____ _____
Interest from date of note to _____
Collect _____ months of town, state and county taxes
VA Appraisal fee to be paid by_____

An example stipulated by the parties to be typical of a residential real estate loan originated by the petitioner involved herein is as follows: It assumes the sale of a residence for $10,309, the purchase of which is to be financed by a downpayment of $309 and a note for $10,000 bearing interest at the rate of 7 percent and guaranteed by VA or insured by FHA. The case assumes four "points," three of which are allocable to the seller and one allocated to the buyer (which respondent calls a loan origination fee). The "closing" of the loan is handled by a "closing attorney" who accounts for the cash and note and supervises exchanges of the documents. The buyer of the residence will submit or execute at the closing the following:

Funds for:
Downpayment _____ $309
"Point" or "loan origination fee"_____ 100
Other costs not material here_____ x
                                                 ____
                                                 409
Note and mortgage_____ 10,000
                                                 _____
    Total _____ 10,409

Metropolitan will submit a check for $9,600 for which it will receive the $10,000 note and mortgage. The seller will receive a check for $10,009, which is composed of the $309 downpayment and $9,700 proceeds from the note. The closing attorney then submits the note, mortgage, and other documents to Metropolitan and pays for the following items: Appraisal (unless previously paid to Metropolitan by buyer); credit report (unless previously paid to Metropolitan by buyer); title search (covers preparation of note and deed of trust); title insurance; real estate taxes; fire insurance; survey; recording fee.

After the closing is conducted, petitioner reviews the title policy and the deed of trust. The settlement sheets are also reviewed to ascertain

whether the fees and expenses incurred were proper and allowable under FHA and VA standards. It then submits these documents, together with the mortgage and note, to the appropriate governmental agency for review. In the case of a VA-guaranteed mortgage, petitioner must also prepare and submit a certification of disbursement of the loan proceeds. In this example, it is estimated by petitioner that the note will sell for $9,700, or the petitioner will have a commitment from a permanent investor to purchase the $10,000 note and mortgage for $9,700. Petitioner would have determined the number of discount points to be charged for a mortgage approximately 45 days prior to closing on the basis of its knowledge of the lending patterns of permanent investors, its anticipation of the condition of the mortgage market at the time of the disposition of the note and mortgage, upon its awareness of what its 35 local competitors were charging, and after a review of available information relating to the mortgagor.

The mortgage loans originated by petitioner were sold to permanent investors as quickly as petitioner's business judgment dictated. Factors affecting its ability to quickly dispose of the note and mortgage included receipt of the recorded deed of trust and title policy by petitioner, inspection of the property by the lender if necessary, and a current status of the borrower's installment payments. Metropolitan's average holding period for the mortgage loans it originated was approximately 4 months. During periods in which the market for mortgages declined petitioner held the mortgage loans for a longer period of time so as to avoid a loss. Some mortgages originated in 1966 were held for a year and a half in anticipation of more favorable mortgage market conditions. Petitioner's average total expenses of originating mortgages were in excess of 1 percent of the face value of its mortgages.

On its income tax returns for the periods in issue petitioner did not include in its gross income the 1-percent charges to buyers attributable to mortgage loans in its possession at the ends of such taxable years. In the statutory notice of deficiency mailed to the petitioners, the Commissioner determined:

It is determined that income reported for taxable year ended November 30, 1966, was understated by the amount of $64,041.10 consisting of loan placement fees for services rendered to borrowers. Since the accrual method of accounting was elected as your basis for computing income in your books and permission of the Commissioner of Internal Revenue for a change in such method was not obtained, the omitted income of $64,041.10 is added to commission income from mortgages which was reported to be $189,206.82.

It is determined that reported income of the subsidiary Metropolitan Mortgage Fund, Incorporated, was understated by the net amount of $12,123.57 due to the failure to accrue income from loan placement fees with respect to mortgage notes which had not been resold prior to November 30, 1966. Under the accrual method of accounting adopted by you, income from loan fees must be accrued.

ULTIMATE FINDING OF FACT

The 1 percent which petitioner charges the applicant for a residential loan constitutes a fee in the nature of compensation in petitioner's hands.

OPINION

Petitioner, during the taxable years involved, originated loans for buyers of single-family dwellings. The loans were secured by conventional mortgages and mortgages guaranteed or insured by the Veterans' Administration and the Federal Housing Administration.

Petitioner originated loans on its own account and also as a broker. The loans which petitioner originated on its own account were sold to permanent investors pursuant to loan commitment agreements.

Petitioner charged the borrower 1 percent of the face of the note which it characterizes as "points" and which respondent describes as "loan origination fees."

The sole issue to be decided is the tax treatment of such charges.

Petitioner is on the accrual method of accounting. It did not report as income such charges when the loans were made. The Commissioner, in his statutory notices of deficiency, made the following determinations:

It is determined that income reported for taxable year ended November 30, 1966, was understated by the amount of $64,041.10 consisting of loan placement fees for services rendered to borrowers. Since the accrual method of accounting was elected as your basis for computing income in your books and permission of the Commissioner of Internal Revenue for a change in such method was not obtained, the omitted income of $64,041.10 is added to commission income from mortgages which was reported to be $189,206.82.

It is determined that reported income of the subsidiary Metropolitan Mortgage Fund, Incorporated, was understated by the net amount of $12,123.57 due to the failure to accrue income from loan placement fees with respect to mortgage notes which had not been resold prior to November 30, 1966. Under the accrual method of accounting adopted by you, income from loan fees must be accrued.

The positions taken by the parties may be summarized as follows. Petitioner contends that the charges represent "points" which are in the nature of discount or interest and are taxable to it over the life of the note if the note is retained. If the note is sold, argues petitioner, the charges will be taxed because they are reflected by a reduction in the cost basis of the note. Petitioner relies primarily upon revenue rulings which deal with the tax treatment of "points." Respondent takes the position that the charges are fees for arranging the loans for the borrowers and when the loans are "closed" petitioner has earned the fees and they represent taxable income at that time because petitioner reports its income on the accrual method of accounting. Respondent relies upon *Columbia State Savings Bank*, 15 B.T.A. 219

(1929), affd. 41 F. 2d 923 (C.A. 7, 1930); *North-Western Trust & Savings Bank*, 20 B.T.A. 365 (1930); *The Bonded Mortgage Co. of Baltimore*, 27 B.T.A. 965 (1933), affirmed on this issue 70 F. 2d 341 (C.A. 4, 1934).

The hypothetical case stipulated by the parties illustrates the charges with which we are concerned. It assumes the sale of a residence for $10,309, the purchase of which is to be financed by a downpayment of $309 and a note for $10,000 bearing interest at the rate of 7 percent and guaranteed by VA or insured by FHA. Petitioner did not prove that conventional loans were handled any differently than VA or FHA loans nor did it prove the amounts of the charges for such loans during the years before us. We are, therefore, unable to draw any distinction in this case between VA, FHA, and conventional loans. The case assumes four "points," three of which are allocable to the seller and one allocated to the buyer (which respondent calls a loan origination fee). The "closing" of the loan is handled by a "closing attorney" who accounts for the cash and note and supervises exchanges of the documents. The buyer of the residence will submit or execute at the closing the following:

```
Funds for:
  Downpayment _____ $309
  "Point" or "loan origination fee"_____  100
  Other costs not material here_____    x
                                                                   ------
                                                                      409
Note and mortgage_____ 10, 000
                                                                   ------
    Total _____ 10, 409
```

Metropolitan will submit a check for $9,600 for which it will receive the $10,000 note and mortgage. The seller will receive a check for $10,009, which is composed of the $309 downpayment and $9,700 proceeds from the note.

It is apparent from the example that the $300 which the seller did not receive from the note represents the "points." It is equally apparent that petitioner has received a note valued in the transaction at $9,700 by an expenditure of only $9,600. The $100 difference is the subject of our inquiry. Does it represent a charge for borrowing the money in the nature of "points" (interest), or does it represent a fee, commission, or service charge which the buyer pays petitioner for arranging the loan?

Based upon all the facts we conclude that the $100 borne by the purchaser of the residence is a fee or commission earned by petitioner and not a payment of interest for the use of money. The buyer of the residence is charged 1 percent regardless of the money market.

We conclude that the interest which the buyer of the residence must pay is reflected in the rate of interest borne by his promissory note. The "points" or discount borne by the seller of the house (3 points or 3 percent in the example), are borne by him because he wants all cash and must sell the note and mortgage for that price to a mortgage banker who buys it for that price because of the maximum interest rates that are permitted on VA or FHA loans, the various interest rates on residential loans, the trends of interest rates, and the general money market.

As set forth in detail in our findings of fact, petitioner performs substantial services in making a loan.

We conclude that petitioner realized taxable income at the closing when the loan was consummated and it, in effect, invested the commission it earned ($100 in our example) in the promissory note it acquired from the seller. This $100 in our example must be added to the $9,600 petitioner paid for the note to equal the $9,700 which the seller received for the note. In an arm's-length transaction the parties receive things of equal value. *United States* v. *Davis*, 370 U.S. 65 (1962).

Having found as a fact that the 1-percent charge which petitioner obtained from the borrower represents a commission for securing the loan, it follows that such a commission is taxable to petitioner, an accrual basis taxpayer, at the time the loan is consummated.

We first considered this question in *Columbia State Savings Bank*, 15 B.T.A. 219 (1929), affd. 41 F. 2d 923 (C.A. 7, 1930). In that case, petitioner, an accrual basis taxpayer, charged a commission for making a loan which it deducted from the face of the note, giving the net to the borrower. That petitioner contended that it was in the business of selling the loans it made and realized no income until the loan was sold. We rejected petitioner's contention and held the commission to be compensation for services rendered and taxable when the loan was consummated. We based our decision upon the following facts:

1. When the loan was consummated, the transaction was complete insofar as the petitioner's right to the commission.

2. The liability of the borrower to pay the commission was not dependent or contingent upon the passage of time as is the case of interest on borrowed money.

3. Upon execution of the note the borrower's obligation to pay the commission became definitely fixed and determined.

4. Even if the commission was not received it was accrued income to petitioner because it was a definite fixed obligation of the maker of the note and was not subject to reduction in the event of prepayment. We recognize a factual difference between that case and the instant

case; i.e., that the commission was deducted from the face of the note there. We think the difference is immaterial because here the commission is reflected in a lower out-of-pocket cost of the note to petitioner (in the example a $9,700 note acquired for $9,600). Petitioner accordingly realizes an immediate benefit of $100 at the closing. Our decision was affirmed by the Seventh Circuit. In *North-Western Trust & Savings Bank*, 20 B.T.A. 365 (1930), we followed *Columbia State Savings Bank*, *supra*, as we later did in *The Bonded Mortgage Co. of Baltimore*, 27 B.T.A. 965 (1933).

In *Bonded Mortgage*, a commission was charged the borrower and deducted from the face of the note. Petitioner was an accrual basis taxpayer. Petitioner used the mortgages it thus acquired as security for issuing its bonds and sought to deduct the costs of the bond issues at the time such costs were incurred. We held that the petitioner realized income from the commissions when the loans were consummated and that the expenses of issuing the bonds must be prorated over the life of the bonds. The Court of Appeals for the Fourth Circuit affirmed us on the issue involved here on the authority of *Columbia State Savings Bank*, *supra*, and *North-Western Trust & Savings Bank*, *supra*, but reversed us as to the expenses of issuing the bonds, holding that the reporting of the income and deducting the expenses should coincide. An appeal in the instant case would lie to the Fourth Circuit. Petitioner cites no judicial authority to the contrary.

Petitioner cites no authority contrary to our established position which has been affirmed by two Courts of Appeals, one of which is the court to which an appeal in this case will lie. Instead, petitioner attempts to draw inferences and factual distinctions from published revenue rulings.[1]

We have carefully examined the revenue rulings cited by petitioner and have carefully considered petitioner's argument as to their applicability. We conclude that petitioner, in vain, attempts to equate the 1-percent fee it charges the borrower with "points" which are charged the seller and such an analogy begs the question. We have found as a fact that the 1-percent charge made by petitioner to the borrower is for services in placing the loan and not interest to adjust the interest rate. The rulings which deal with "points" do not apply. Labels are unimportant. We do not decide this case on the basis of any revenue ruling but upon a factual determination which brings it within the rationale of our opinions set forth above.

Petitioner also contends that the Commissioner has imposed an arbitrary method of accounting on petitioner by the treatment he has determined for the 1-percent charge. Such argument has no merit. Petitioner elected the accrual method of accounting and the cases cited above, dating back to 1929, hold that under such method the

---

[1] Rev. Rul. 57–541, 1957–2 C.B. 319; Rev. Rul. 65–95, 1965–1 C.B. 208; Rev. Rul. 67–297, 1967–2 C.B. 87; Rev. Rul. 68–650, 1968–2 C.B. 78; Rev. Rul. 69–188, 1969–1 C.B. 54; Rev. Rul. 70–540, 1970–2 C.B. 101; Rev. Rul. 72–523, 1972–2 C.B. 242.

charges involved here constitute income at the time the loans are consummated. We do not view this case as a change in method of accounting but, instead, failure to include in income under the method of accounting currently in use an item which has long been held to constitute income. Petitioner argues that it should be permitted to value its inventory of mortgage loans in accordance with Rev. Rul. 72–523, 1972–2 C.B. 242. That ruling was issued after the trial of the instant case. The valuation of inventories has not been pleaded and no motion has been filed to reopen the record. Petitioner did not utilize inventories in the method of accounting reflected on its income tax returns. Under such circumstances, we cannot consider such issue.

Our determination of the character of the 1 percent which petitioner charges the buyer is strictly for deciding the tax consequences to petitioner and we do not imply whether the buyer may or may not deduct such payment as interest.

*Decisions will be entered for the respondent.*