CHESAPEAKE FINANCIAL CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10623–78.     Filed May 27, 1982.

*Richard W. Case* and *David Bielawski*, for the petitioner. *R. Dale Eggleston*, for the respondent.

WILBUR, *Judge*: Respondent determined deficiencies in peti-

---

tioner's 1973, 1974, and 1975 Federal income taxes in the respective amounts of $438,892.76, $145,186.67, and $70,163.54. Concessions having been made, the sole issue for decision is whether petitioner was entitled to defer the recognition of permanent loan commitment fees until the related permanent loans were funded.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner Chesapeake Financial Corp. (Chesapeake) is a corporation organized and existing under the laws of the State of Maryland, having its principal office in Baltimore, Md. Chesapeake timely filed its U.S. corporation income tax returns for the tax years ending July 31, 1973, July 31, 1974, and July 31, 1975, with the Internal Revenue Service Center at Philadelphia, Pa. Chesapeake maintained its books and records and reported its income on the accrual basis.

During the taxable years at issue, Chesapeake made construction and permanent loans available to developers by obtaining loans from commercial banks, savings banks, savings and loan companies, insurance companies, and other financial institutions (hereinafter referred to as institutional investors). Chesapeake derived two principal sources of income from these activities: (1) Income received for servicing mortgage loans for institutional investors and (2) income received in connection with the origination of mortgage loans. Chesapeake's loan origination income consisted in part of construction and permanent loan commitment fees in return for services in arranging loans for the construction and permanent financing of commercial projects.

A typical transaction providing for a permanent loan is usually initiated by an application submitted by the borrower to Chesapeake. The application contains a comprehensive description of the proposed project, including plans, specifications, and other details. Upon receipt of the application, Chesapeake makes a preliminary determination as to whether the proposed project is economically feasible. If it decides that it is, Chesapeake then obtains the borrower's authorization to place the loan with an institutional investor. At that time, the borrower agrees to pay Chesapeake the commitment fee for

the permanent loan and to pay a "nonrefundable fee" to the institution ultimately making the permanent loan, if such a fee is subsequently required by the institutional investor.

When Chesapeake has the borrower's application in final form, it goes through a process called underwriting the loan which involves a comprehensive appraisal of the proposed project. If the comprehensive appraisal is favorable, Chesapeake then prepares a loan submission which it forwards to a prospective institutional investor. The loan submission consists of all available information concerning the project including its plans, specifications, and economic characteristics together with Chesapeake's evaluation and recommendations concerning the project's income potential and the risk factors involved. As part of the loan submission, Chesapeake includes its recommendations concerning the terms of the proposed loan.

If the institutional investor approves the loan, it issues its commitment to Chesapeake which, upon acceptance, will constitute a contract between the institutional investor and Chesapeake. The institutional investor's commitment specifies the terms of the proposed loan and the conditions under which the institutional investor will be obligated to make the loan. It generally requires that Chesapeake pay a nonrefundable fee to the institutional investor at the time Chesapeake accepts the commitment. Typically, the institutional investor's commitment further provides that, if for any reason the committed loan is not consummated, Chesapeake will be obligated to pay the institutional investor an additional "deposit fee" for failure to consummate the loan. The deposit fee is usually equal to 1 percent of the amount of the proposed loan. Upon the borrower's request, Chesapeake may also obtain a commitment from the institutional investor for a construction loan for the cost of constructing the proposed project.

Upon receipt of the commitment for the construction and permanent loans from the institutional investor, Chesapeake prepares and issues its own commitment to the borrower, incorporating all the terms and conditions of the commitment from the institutional investor to Chesapeake, except such matters as may be subject to negotiation between Chesapeake and the borrower. Chesapeake's commitment to the borrower requires the borrower to pay Chesapeake the construction and

permanent loan commitment fees provided for in the application, and an additional fee equal to the nonrefundable fee payable by Chesapeake to the institutional investor. One of the items subject to negotiation between Chesapeake and the borrower is the obligation of the borrower to pay Chesapeake a deposit fee corresponding to the deposit fee payable by Chesapeake to the institutional investor if the permanent loan is not funded. Chesapeake may obtain from the borrower a deposit fee in an equal amount or, because of the intense competition in the mortgage banking industry, Chesapeake may obtain a deposit fee only in a lesser amount, or no deposit fee at all. Any deposit fee negotiated may be deposited with Chesapeake in cash or it may be represented by a promissory note made payable to Chesapeake.

The permanent loan commitment fee is due and payable upon the borrower's acceptance of Chesapeake's commitment. The borrower usually pays this fee at the time of such acceptance. However, if Chesapeake has also arranged for construction financing, the borrower sometimes pays the fee out of the first draw of the construction loan. In no event is the fee paid subsequent to that time. Either method of payment would occur at approximately the same time and in the same tax year since after the borrower accepts the permanent and construction loan commitment, the construction loan is promptly settled, and the first draw on the construction loan is then disbursed for the payment of the borrower's initial expenses.

Permanent loan commitment fees were retained by Chesapeake in its deferred income account until the related permanent loans were funded. In the ordinary course of business, the permanent loan would be funded at the conclusion of construction and the proceeds of the permanent loan would be applied to the payment of the construction loan. It was at that time that Chesapeake transferred the permanent loan commitment fee to an income account for financial accounting purposes and treated the fee as income for tax purposes.

The obligation of the institutional investor to fund the permanent loan is dependent upon the fulfillment of the terms and conditions specified in its commitment to Chesapeake. The parties stipulated a typical mortgage loan commitment executed by and between Chesapeake and Metropolitan Life Insur-

ance Co. (Metropolitan), dated June 24, 1974. This mortgage loan commitment provides for a $29,500 cash fee payable by Metropolitan to Chesapeake upon purchase of the loan (see p. 874 *infra*), for a $49,000 nonrefundable commitment fee to be paid to Metropolitan at the time of Chesapeake's acceptance of the commitment, and for a deposit fee of $49,000 by Chesapeake payable to Metropolitan in the event of Chesapeake's default on the commitment. The commitment further states that Metropolitan's agreement to purchase the loan is subject to the satisfaction of certain conditions regarding the note, the mortgage, and the property which is the subject of the commitment. The conditions specified are: the note and security instrument shall be in the form satisfactory to Metropolitan; rental income of the property, the credit of the borrower, and other features of the transaction shall be provided in the application without any material or adverse change; paid-up hazard insurance on the property must be procured in Metropolitan's favor; a survey and licensed surveyor's certificate dated not more than 6 months prior to the loan purchase date shall be furnished; title insurance insuring Metropolitan as holder of the mortgage shall be delivered; all taxes and assessments affecting the real property shall have been paid; governmental regulations shall have been satisfied; the borrower shall execute an estoppel affidavit stating the unpaid amount of the loan and that no defenses or setoffs exist with respect thereto; the mortgage to be given by the borrower shall provide for the payment, concurrently with interest and principal installments, of an amount necessary to enable the mortgagee to pay all taxes, assessments, and similar charges affecting the real property; and certain other conditions including an annual rent roll of not less than $780,000 certified to by Chesapeake.

Institutional investors sometimes monitor the project during the construction phase to insure that the project is being constructed in conformance with the plans and specifications set forth in its commitment letter. However, most of the institutional investors that Chesapeake deals with are located outside of Maryland. Since these out-of-State institutions have neither the staff available locally nor the local expertise to perform these functions, they often rely on Chesapeake to

assure that all the conditions specified in their permanent loan commitments have been met prior to funding the loans.

Accordingly, Chesapeake has various responsibilities and duties to perform to insure that construction of the project is conforming to these specifications. These responsibilities and duties include periodically inspecting the project during construction, obtaining approval of change orders, verifying the rent roll, monitoring adverse changes, and processing the documents which must be delivered at the settlement of the permanent loan.

Chesapeake receives a fee from the institutional investor to compensate it for the performance of these services. For example, the commitment executed between Metropolitan and Chesapeake obligated Metropolitan to pay a $29,500 cash fee to Chesapeake upon Metropolitan's purchase of the loan. Part of this fee was paid as compensation to Chesapeake for performing these aforementioned services during the period of construction.

The parties also stipulated as representative a correlative permanent loan commitment executed by and between Chesapeake and Maryland Properties, Inc., dated June 26, 1974. The permanent loan commitment from Chesapeake to Maryland Properties, Inc., states that Chesapeake agrees to grant Maryland Properties, Inc., a first mortgage loan in the amount of $4,900,000 subject to certain specified conditions which, for the most part, are the same conditions set forth in the mortgage loan commitment executed by and between Chesapeake and Metropolitan. In addition, the commitment provides for the payment of Chesapeake's fees:

> Presuming you find the terms and conditions satisfactory, we would appreciate [your] executing and returning the enclosed copy of this letter together with your check for $49,000.00 on or before July 10, 1974, which represents the non-refundable commitment fee to the lender. In addition, $24,500.00 is due and payable to Chesapeake Financial Corporation which represents our fee for the placement of the permanent loan. In addition, please return to us along with your acceptance a non-interest bearing note in the amount of $24,500.00 which represents the deposit fee to Chesapeake Financial Corporation. If for any reason a settlement does not take place after acceptance, this note will be presented for payment in full.

At the time the borrower accepts Chesapeake's commitment, Chesapeake's right to the commitment fee paid by the borrower is fixed. Nevertheless, Chesapeake adopted and

followed the practice of reporting its permanent loan commitment fees in income at the time that the related permanent loans were funded on the advice of its independent certified public accountant. Expenses incurred by Chesapeake for the services in issue were deducted when incurred rather than at the time the commitment fee was reported in income.

The time period in which Chesapeake performed those services subsequent to its receipt of the fees—from the time it received and recorded the permanent loan commitment fees until the time the permanent loan was funded—spanned from two to five taxable periods. Below is an illustration of the number of taxable periods involved with respect to each of the fees in issue from the time the permanent commitment fees were recorded by Chesapeake through the date the permanent loans were funded:

| Builder or property name | TYE in which commitment fee received | Permanent loan closing date | Number of taxable periods (inclusive) |
|---|---|---|---|
| Bonnie Ridge Apartments II | 7/31/73 | 10/22/74 | 3 |
| Marriott Square Apartments | 7/31/73 | 11/12/73 | 2 |
| Leonard Stulman Enterprise Park W. | 7/31/73 | 12/18/73 | 2 |
| Richmar Apartments II | 7/31/73 | 6/18/74 | 2 |
| Rolling Park Apartments | 7/31/73 | 5/3/74 | 2 |
| Timber Neck Apartments | 7/31/73 | 3/25/74 | 2 |
| Briarcliff North Apartments | 7/31/73 | 4/21/75 | 3 |
| Carroll Island Apartments | 7/31/73 | 9/25/75 | 4 |
| Carlyle Apartments | 7/31/73 | 3/12/74 | 2 |
| Club House Apartments | 7/31/73 | NA[1] | NA[1] |
| Engleman Builders, Inc. | 7/31/73 | 9/30/73 | 2 |
| Greenbriar Association Hills Apartments | 7/31/73 | 9/1/76 | 5 |
| Lantern Hills Apartments | 7/31/73 | 2/18/76 | 4 |
| Maple Crest Apartments Section III | 7/31/73 | 11/20/74 | 3 |
| Maple Crest Apartments Section IV | 7/31/73 | 2/28/77 | 5 |
| Middleborough Apartments | 7/31/73 | 4/21/75 | 3 |
| Morningside Heights | 7/31/73 | 5/2/74 | 2 |
| R & R Associates | 7/31/73 | 6/17/74 | 2 |
| Ryland Group—I | 7/31/73 | NA | NA |
| Monumental Title Co. | 7/31/73 | 11/30/73 | 2 |
| Universal Housing & Development Co. | 7/31/73 | 3/27/75 | 3 |
| CALS Development, Inc. | 7/31/73 | NA | NA |
| Perez Minaya—Escorial | 7/31/73 | 11/14/74 | 3 |
| Greenbriar Association Hills Apartments | 7/31/74 | 6/30/75 | 2 |

| Builder or property name | TYE in which commitment fee received | Permanent loan closing date | Number of taxable periods (inclusive) |
|---|---|---|---|
| Perez Minaya, Inc. | | | |
| Baldorioty de Castro | 7/31/74 | NA | NA |
| ARC Corp. | 7/31/74 | 8/31/76 | 4 |
| Executive Plaza IV | 7/31/74 | 5/31/77 | 4 |
| McKenzie Bldg. | 7/31/74 | 2/28/75 | 2 |
| Normandy Woods Apartments | 7/31/74 | 12/30/76 | 4 |
| T. R. Associates | 7/31/74 | 10/15/75 | 3 |
| Universal Housing | | | |
| Office Bldg. | 7/31/74 | 3/27/75 | 2 |
| George Duvall | 7/31/75 | NA | NA |
| Interstate Industrial Park | 7/31/75 | NA | NA |
| Middle Crest Townhouses | 7/31/75 | 4/6/76 | 2 |
| Nathan Hackerman Lodges | 7/31/75 | NA | NA |
| Timonium Office Bldg. | 7/31/75 | NA | NA |
| Free State Construction Co. | 7/31/75 | NA | NA |
| J & P Homes | 7/31/75 | NA | NA |
| W. B. Dobson, Inc. | 7/31/75 | NA | NA |
| Wincamp Partnership | 7/31/75 | NA | NA |
| El Cerro Corp. | 7/31/75 | 7/31/77 | 3 |

[1] NA indicates situations in which the permanent loan was never funded.

Chesapeake's method of accounting for its permanent loan commitment fees does not clearly reflect income.

## OPINION

Chesapeake is a mortgage banker whose business activities consist of arranging loans for the construction and permanent financing of commercial projects. In the typical transaction, Chesapeake reviews the borrower's application for financing and, if it determines that the project is economically feasible, attempts to secure a commitment from an institutional investor to provide permanent financing. If such a commitment is obtained, Chesapeake issues its own commitment to the borrower. In return, the borrower is required to pay Chesapeake a commitment fee at the time it signs and accepts the permanent loan commitment letter. For both financial accounting and income tax purposes, Chesapeake did not include the permanent loan commitment fee in income at the time of its receipt. Rather, Chesapeake retained these fees in its deferred income account and included them in income only when the related permanent loan was actually funded, normally at the conclusion of construction. The issue for decision is whether Chesapeake was entitled to defer the recognition of

the permanent loan commitment fees until the permanent loans were funded.

Chesapeake, an accrual basis taxpayer, argues that under the "all events" test, it had not earned its fee until the permanent loan was actually funded, at which time the fee was properly includable in income. Respondent contends, however, that Chesapeake was required to include the fees in income upon receipt, since at that time, all events had occurred which fixed its right to receive the income. Relying heavily on the decisions of the Supreme Court, *Automobile Club of Michigan v. United States*, 353 U.S. 180 (1957); *American Automobile Association v. United States*, 367 U.S. 687 (1961); and *Schlude v. Commissioner*, 273 U.S. 128 (1963), respondent contends that deferral beyond receipt of such amounts does not clearly reflect income within the meaning of section 446(b).[1] Chesapeake counters that the Supreme Court in these decisions did not establish a rule that a taxpayer can never defer recognition of prepaid service income. Rather, relying on *Artnell v. Commissioner*, 400 F.2d 981 (7th Cir. 1968), revg. and remanding 48 T.C. 411 (1967), petitioner contends that its method of accounting clearly reflected income since: (1) It complied with generally accepted accounting principles, and (2) the services it was required to perform after it received its commitment were certain to be rendered within a specific time period. We agree with respondent.

Section 446(a) provides that taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income. Section 446(c) permits the taxpayer to choose from several methods of accounting, including the accrual method. Under the accrual method, income is to be included for the taxable year when all the events have occurred which fix the right to receive such income and the amount can be determined with reasonable accuracy. Secs 1.446–1(c)(1)(ii) and 1.451–1(a), Income Tax Regs. Under this test, it is the fixed *right* to receive the income that is controlling and not whether there has been actual receipt thereof. *Spring City Foundry Co. v. Commissioner*, 292 U.S. 182, 184 (1934).

---

[1]All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

Section 446(b) provides that if the method of accounting used by the taxpayer does not clearly reflect income, taxable income shall be computed under such method as, in the opinion of the Commissioner, does clearly reflect income. "Method of accounting" as used in section 446 includes not only the taxpayer's overall method of accounting (in this case, accrual) but also the accounting treatment of particular items. See sec. 1.446–1(a)(1), Income Tax Regs.; *Sandor v. Commissioner*, 62 T.C. 469 (1974), affd. 536 F.2d 874 (9th Cir. 1976).

Chesapeake's commitment fees were received as a payment for specific services rendered to the borrower in arranging for a favorable loan package for the borrower with an institutional investor. These services which consisted of underwriting and arranging the loan were performed by Chesapeake prior to its receipt of the commitment fees. Specifically, these services included initially evaluating the economic potential of the proposed project, finding a willing investor to provide financing and then negotiating two separate commitments, one from the institutional investor and one that it issues to the borrower. Indeed, Chesapeake's contract with the borrower specifically provides that the commitment fee is "due and payable" by the borrower at the time the commitment is signed.

Chesapeake argues that its fees were not earned at the time of receipt since it was required to perform substantial services during the construction period but before the permanent loan was funded. These services include surveys of the project to insure that there are no adverse changes, and preparation of a deed of trust note, an estoppel affidavit, a deed of title, and various leases which are assigned to the investor as additional security.

But these services were pursuant to Chesapeake's commitment to the institutional investor and not the borrower. Since most of the large institutional investors are located outside of the Maryland area (where the projects were under construction), the investors rely on Chesapeake to perform these services, generally paying Chesapeake a fee in return. For example, the mortgage loan commitment contract executed with Metropolitan Life Insurance Co. requires Metropolitan to pay Chesapeake a $29,500 cash fee upon Metropolitan's purchase of the loan. Mr. Quinn, testifying on behalf of

petitioner, stated that this fee was paid "to compensate the mortgage banker partially for some of the work it's [sic] performed in the time from when the construction loan was closed through permanent funding" while a portion of it constituted advance payment to Chesapeake for servicing the loan. Mr. Quinn further stated that "The obligation we have to perform those services is to the institutional investor." When the borrower accepted Chesapeake's commitment, the transaction was complete insofar as Chesapeake's right to the commitment fee. Cf. *Metropolitan Mortgage Fund, Inc. v. Commissioner*, 62 T.C. 110 (1974); *Columbia State Savings Bank v. Commissioner*, 15 B.T.A. 219 (1929), affd. 41 F.2d 923 (7th Cir. 1930). Accordingly, Chesapeake's right to the fee accrued at the time its commitment letter was accepted. See *Spring City Foundry Co. v. Commissioner*, 292 U.S. 182 (1934).

Petitioner nevertheless contends that the commitment fee might have to be refunded if the permanent loan were not funded, and that this possibility precludes accrual of the fee when received. We disagree. The representative permanent loan commitment contract entered into between Chesapeake and Maryland Properties, Inc., provides that the commitment fee is "due and payable" upon the borrower's acceptance of the commitment. The contract does not provide that the fee will be refunded to the borrower in the event that financing is ultimately not provided. When the borrower accepted the commitment, the obligation to pay became fixed and the terms of the commitment fixed the amount to be received. In addition, in the event of nonfunding, it is doubtful whether Chesapeake would be liable to return the commitment fee to the borrower, especially where the investor's refusal to fund the permanent loan was due to the borrower's lack of compliance with conditions relating to the project's construction phase. Unless there has been a breach of contract by Chesapeake or the institutional borrower, it is hard to conceive of circumstances requiring Chesapeake to refund the commitment fee. Since Chesapeake's entitlement to its commitment was fixed at the time the commitment letter was signed and accepted by the borrower, under the "all events" test, the fee was includable at that time.

This is entirely consistent with the Supreme Court decisions in *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180

(1957); *American Automobile Association v. United States*, 367 U.S. 687 (1961); and *Schlude v. Commissioner*, 372 U.S. 128 (1963). These cases and others following them forbid deferral of "prepaid income on the theory that it has not yet been 'earned' by the performance of services, delivery of goods, or the giving of other consideration." *Standard Television Tube Corp. v. Commissioner*, 64 T.C. 238, 241, 242 (1975). (Citations omitted.) Petitioner recognizes this but argues that the narrow exception carved out by *Artnell Co. v. Commissioner*, 400 F.2d 981 (7th Cir. 1968), revg. and remanding 48 T.C. 411 (1967), and *Boise Cascade Corp. v. United States*, 208 Ct. Cl. 619, 530 F.2d 1367 (1976), should be accepted by this Court and applied in these circumstances. In *Artnell*, a baseball team reported only the receipts for advance ticket sales for games that could be played in the taxable year. Advance receipts that related to games to be played in the following taxable year were deferred. Relying on the Supreme Court cases, we held that the advance receipts were includable in income when received. The Seventh Circuit reversed, holding that the Supreme Court trilogy did not create a per se rule against deferral of prepaid income. 400 F.2d at 985. The court found that the taxpayer's method clearly reflected income since the baseball schedule permitted an exact matching of income and expenses. The Supreme Court decisions were distinguished due to the taxpayer's inability in these cases to precisely match income and the services by which the income was earned. The court stated:

> The uncertainty stressed in those decisions is not present here. The deferred income was allocable to games which were to be played on a fixed schedule. Except for rain dates, there was certainty. We would have no difficulty distinguishing the instant case in this respect. [400 F.2d at 984.]

In *Boise Cascade Corp. v. United States, supra,* an accrual basis taxpayer was in the business of rendering engineering and related services. Billing and payment often preceded the rendition of services. The taxpayer did not include the prepaid amounts in income until the services were performed. Finding that the contractual obligations were fixed and definite, the services were not dependent upon client demand or request, and that the costs of producing the revenue were incurred at the time of performance of services, the court held that there was an accurate matching of costs and income. Thus, there

was no material distortion of income under the taxpayer's method.[2]

We need not decide whether to adopt the rationale of the Seventh Circuit and the Court of Claims, for *Artnell* and *Boise Cascade* are clearly inapplicable to the facts before us. Chesapeake's accounting system operated to defer the recognition of taxable income to a taxable period in which many of the related services and expenses may not have been performed or incurred. Indeed, the time period in which Chesapeake performs those services—from the time it received the commitment fees and recorded them on its books until the time the loan was funded—spanned from two to five taxable periods. A significant portion of the services provided to the borrower (i.e., underwriting the loan) were performed prior to the commitment. Even if some of the postcommitment services are assumed to be provided to the borrower rather than the lender, we lack a precise breakdown as to recipient served or the time the service was provided.

Additionally, Chesapeake incurred expenses in various taxable years, some before the receipt of income and some after, while deferring recognition of *all* income relating to the loan transaction until permanent funding. In contrast to *Artnell* and *Boise Cascade*, the present case does not provide the occasion to ask whether the Supreme Court trilogy "left an opening for a decision that under the facts of a particular case, the time and extent of future performance might be so certain, and the matching of income and expenses so demonstrable, that deferral would clearly reflect income." Malman, "Treatment of Prepaid Income—Clear Reflection of Income or Muddied Waters," 37 Tax L. Rev. 103, 120 (1981).[3]

---

[2]In *RCA Corp. v. United States*, 664 F.2d 881 (2d Cir. 1981), the Second Circuit reversed a District Court decision and disallowed deferral of prepaid service income. In *RCA*, the service contracts called for repair services to be rendered to purchasers of new television sets upon demand for periods ranging from 3 to 20 months after the date of purchase. Relying on *Schlude v. Commissioner*, 372 U.S. 128 (1963); *American Automobile Association v. United States*, 367 U.S. 687 (1961); and *Automobile Club of Michigan*, 363 U.S. 180 (1957), the court sustained the Commissioner's position that RCA's method of accounting for income from these prepaid service contracts did not clearly reflect income under sec. 446(b).

[3]Petitioner argues that the services were certain to be performed within a definite period and not subject to customer demand. But even under *Artnell Co. v. Commissioner*, 400 F.2d 981 (7th Cir. 1968), revg. and remanding 48 T.C. 411 (1967), and *Boise Cascade Corp. v. United States*, 208 Ct. Cl. 619, 530 F.2d 1367 (1976), the taxpayer must *at a minimum* show

In view of the foregoing, we conclude that Chesapeake's method of accounting with respect to the commitment fees fails to clearly reflect income. The Commissioner's determination that the permanent loan commitment fees in question are taxable in the year of receipt must be sustained.

*Decision will be entered under Rule 155.*

---

the year in which the services are to be rendered *and* that the income deferred is recognized as the services are rendered and the correlative expenses incurred. Petitioner misses this threshold by a significant margin.

Petitioner also argues their procedures comply with recommendations of the Accounting Standards Division for accounting for loan commitment fees. Actually, petitioner acts as a conduit between lender and borrower and the "commitment fees" are more properly described as "loan placement fees" dealt with in a different paragraph of these recommendations. But assuming, arguendo, that petitioner correctly interprets these recommendations, we would simply point out that the statute before us, as interpreted by the Supreme Court, imposes standards that deviate from financial accounting.