PACIFIC FIRST FEDERAL SAVINGS & LOAN ASSOCIATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6114–80.     Filed September 23, 1982.

---

*Donald W. Hanford,* for the petitioner.
*Wayne R. Appleman,* for the respondent.

DRENNEN, *Judge*: Respondent determined a deficiency of $834,778 in petitioner's 1976 Federal income tax. Due to concessions, the only issue is whether a "loan origination fee" charged by petitioner in connection with loans it made constituted interest, a charge for services, or, in part, both.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by reference.

Petitioner Pacific First Federal Savings & Loan Association had its principal office in Tacoma, Wash., at the time it filed the petition herein. Petitioner filed its income tax return for the taxable year 1976 with the Western Service Center, Ogden, Utah.[1]

Petitioner is engaged in the business of making loans for the purchase or construction of commercial and residential real estate. During the calendar year 1976, petitioner loaned in excess of $235 million for such purposes. All of these loans were conventionally financed except for approximately $700,000 of FHA- and VA-insured loans. The loans were primarily long-term loans, generally for 30 years. Over 90 percent of the loans were held by petitioner until prepayment or maturity.

The typical real estate loan made by petitioner began with an interview of the prospective borrower to collect financial, credit, and personal information so as to determine if its preliminary requirements for the loan sought were met. The borrower then filed a loan application which petitioner verified for accuracy. Petitioner then ran a credit check on the

---

[1] Petitioner is a calendar year taxpayer and reports its income on the accrual method of accounting.

borrower and obtained an appraisal of the real property to be used as collateral for the loan.[2] The loan application was then submitted to petitioner's loan committee for approval. If the loan was approved, a preliminary title report was prepared, and petitioner drew up the documents necessary to obtain a first lien position in the real property as collateral, including conveyancing documents, the borrower's note, and the deed of trust. In addition, for construction loans, petitioner inspected the property from time to time to determine the percentage of completion of the project, which governed the timing of loan disbursements. All of the above activities are generally referred to in the savings and loan industry as underwriting activities.

For those loans involving the purchase of real property, petitioner generally prepared closing statements, obtained the signatures of the parties, and recorded the conveyancing and security documents. On some loans an attorney, title company, or escrow closed the sale under instructions provided by petitioner.

Most third-party costs incurred by petitioner in making its loans, such as obtaining a title report and credit report, recording fees, and hazard insurance, were separately charged to and paid by the borrower. However, the borrower was not required to pay for appraisal services or for escrow services performed by either petitioner or a third party. Petitioner provided these services free of charge in order to give it a competitive advantage over other savings and loans associations, most of which did charge for such services.

As consideration for a loan from petitioner, a borrower was required to pay an amount designated as interest over the life of the loan, and a loan origination fee (hereinafter the loan fee) at the time the loan proceeds were disbursed. The loan fee was a fixed percentage of the principal amount of the particular loan, and during 1976, varied from 1 to 4 percent of each loan made. Petitioner collected this fee at the time the loan proceeds were disbursed by debiting the amount of such fee from the proceeds and paying the remainder over to the borrower.

---

[2]The appraisal was usually performed by petitioner's own staff. However, during periods of heavy business, a third party was hired by petitioner to perform the appraisal.

Petitioner charged the loan fee instead of a higher interest rate on its loans so that it could receive a portion of the overall interest yield "up front," rather than collect it over the life of the loan. The common term used in the savings and loan industry in referring to such loan fees is "points."

The loan fee rate and the interest rate charged on a particular loan were negotiated between petitioner and the borrower as mutually dependent variables. Thereafter, the higher the loan fee rate, the lower the interest rate was, and vice versa. The overall interest yield which petitioner sought on a given loan was determined by a combination of the loan fee rate and interest rate charged thereon. Both were determined by the degree of risk involved in making the particular loan and the current money market, taking into consideration the rate charged by competitor savings and loan associations. The loan fee rate charged by petitioner was competitive with those associations.

No relationship existed between the amount of the loan fee charged on a particular loan and the costs incurred by petitioner in underwriting such loan. Indeed, although the loan fee charged on a large loan most likely would be greater than that charged on a small loan by virtue of its being calculated as a percentage of the principal amount of such loan, petitioner engaged in the same underwriting activities for both. In addition, petitioner charged the same fee on a loan irrespective of whether third-party escrow or appraisal services were used.

Approximately 20 percent of the loan applications submitted to petitioner in 1976 did not close. In such case, no loan fee was charged to the borrower, regardless of how far the particular loan application had proceeded.

Petitioner designated the loan fee as a prepaid finance charge on its Federal "truth in lending" statements, and added it to the interest rate in determining the annual percentage rate indicated thereon. The fee was treated as interest for purposes of determining compliance with State usury laws. The loan fees charged by petitioner on its residential mortgage loans were reported as exempt interest for State of Washington business and occupation tax purposes and that treatment has not been challenged by the Washington State Department of Revenue. See Wash. Rev. Code sec. 82.04.430(11) (1974).

Prior to the taxable year 1976, petitioner reported the loan fee, for tax purposes, in a manner provided by the Federal Home Loan Bank Board regulations. Pursuant to that method, petitioner was required to report as income for the year in which received, the amount of the loan fee received equal to 2 percent of the principal amount of the loan in the case of construction loans and 1 percent of such amount in the case of all other loans, plus $200. The balance of the loan fee was taken into income ratably over a period of 7 to 10 years. For accounting purposes, petitioner used the same method.

On January 26, 1976, petitioner filed an application with the Internal Revenue Service to change its method of accounting with respect to the loan fee income. Petitioner sought to change from the method provided by the Federal Home Loan Bank Board regulations to an acceptable method which would allow it to report the loan fee income ratably over a specified period so as to comport with its overall accrual method of accounting. The method also would permit petitioner to defer the reporting of such income. A formula was proposed which was in accordance with Rev. Rul. 64–278.[3] The application indicated that the loan fee included "points, escrow fees, appraisal fees, and inspection fees."

By letter dated January 25, 1977, petitioner submitted additional information in connection with its request for a change of accounting method. In that letter, petitioner indicated that it was applying to change to the "composite method" of accounting[4] (rather than the liquidation method referred to in the letter of January 26, 1976)[5] for reporting the loan fee income, and that such fees represented "points which are in the nature of additional interest."

On March 25, 1977, petitioner was granted approval by the Internal Revenue Service to change its accounting method of reporting "discounted points" "from the method of reporting such points as income in the year in which the loans are made

---

[3]See Rev. Rul. 64–278, 1964–2 C.B. 120.

[4]See Rev. Rul. 54–367, 1954–2 C.B. 109.

[5]Both of these methods provide for ratable inclusion of prepaid interest income, commonly known as points, over a specified period of years. The liquidation method, however, was to be used by cash basis taxpayers, while the composite method was to be used by accrual basis taxpayers.

to the method of reporting discounted points as income in the year in which earned, computed on a composite basis * * * beginning with the year of transaction."

For accounting purposes, petitioner had loan fee income in 1976 in the amount of $4,062,933, which consisted of $3,816,648 of loan fee income received in 1976 and $247,285 of such income received in earlier years and amortized to 1976. On its 1976 income tax return, petitioner reported only $633,164 of loan fee income.[6]

In his statutory notice of deficiency, respondent determined that a portion of the loan fee represented a charge for services rather than for interest (points). Respondent determined that the loan fee income allocable to services amounted to $3,429,769 and could not be deferred pursuant to the composite method, but must be reported in 1976, the year received.[7] He adjusted petitioner's tax liability accordingly.

## ULTIMATE FINDING OF FACT

The loan fees received by petitioner were additional interest income.

## OPINION

The only issue presented is whether the loan fee was a charge solely for interest or was, in part, a charge for services as well.

Petitioner maintains that the loan fee represented additional interest charged by it in connection with its loans. Therefore, petitioner claims that the loan fee income in question was properly deferred to years subsequent to 1976. Conversely, respondent maintains that a portion of the loan fee was a charge for services, and to that extent, the income therefrom

---

[6]Petitioner reported the loan fee income using the liquidation rather than the composite method, for which approval had been given. Petitioner recognized that its calculation was erroneous and used respondent's method of calculation for subsequent years. Because of this error, the parties have stipulated that if we find for petitioner, a recomputation under Rule 155, Tax Court Rules of Practice and Procedure, would be necessary to determine petitioner's correct tax liability for 1976, using the composite method. None of the asserted deficiency herein relates to petitioner's erroneous use of the liquidation method.

[7]Respondent also made other adjustments to petitioner's taxable income, which were not disputed in the petition, some of which were favorable to petitioner and form the basis for petitioner's claim for refund.

must be included in income in 1976, the year received. We agree with petitioner.[8]

Interest is defined as "compensation paid for the use or forebearance of money." *Deputy v. du Pont*, 308 U.S. 488 (1940); *Wilkerson v. Commissioner*, 70 T.C. 240 (1978), revd. on other grounds 655 F.2d 980 (9th Cir. 1981). Whether a particular payment constitutes interest is determined by the facts, not by the terminology used. *Goodwin v. Commissioner*, 75 T.C. 424 (1980), affd. without published opinion ___ F.2d ___ (3d Cir. 1982). The burden of proof on this issue is on petitioner. *Goodwin v. Commissioner*, *supra* at 441; Rule 142(a), Tax Court Rules of Practice and Procedure. For the reasons stated herein, we find that petitioner has met its burden of proof.

First, the loan fee rate charged on a particular loan was dependent upon the same factors relied on in determining the stated interest rate to be charged, namely the degree of risk involved and the current money market. In fact, the loan fee rate and stated interest rate were negotiable and both were mutually dependent, such that the higher one was, the lower the other would be. While petitioner had a bottom-line interest yield that it required on each loan, it was flexible on how much of that yield would be paid "up front" in the way of the loan fee and on how much would be paid over the life of the loan as stated interest. See *Wilkerson v. Commissioner*, *supra* at 255; *L-R Heat Treating Co. v. Commissioner*, 28 T.C. 894 (1957).

Second, there was no relationship between the cost incurred by petitioner in underwriting a loan and the loan fee charged thereon. This is supported by the fact that the loan fee was simply calculated as a percentage of the principal amount of the loan. See *Blitzer v. United States*, 231 Ct. Cl. ___ , 684 F. 2d 874 (1982); *Western Credit Co. v. Commissioner*, 38 T.C. 979 (1962), affd. per curiam 325 F.2d 1022 (9th Cir. 1963). Consequently, although the activities engaged in by petitioner were the same for both large and small loans, the amount of the loan fee on the large loan most likely would be more than that on the small loan. Moreover, if a loan did not close, no loan fee

---

[8]Respondent does not dispute that, to the extent the loan fee constituted a charge for interest, petitioner may properly defer the income therefrom to subsequent years pursuant to the composite method of accounting.

was charged even though petitioner may have performed a substantial amount of underwriting activity in connection with that loan.

Particularly telling in this regard was that all of the third-party costs incurred by petitioner on a loan were charged to and paid by the borrower, *in addition to the loan fee*, with the exception of escrow and appraisal services. See *Wilkerson v. Commissioner, supra*; *Western Credit Co. v. Commissioner, supra*. These services were provided free of charge so that petitioner could keep a competitive edge over other savings and loan institutions which did charge for such services. Further, we do not believe that, as respondent argues, the loan fee was a hidden charge for such services. The loan fee remained the same whether or not third-party escrow or appraisal services were used and the amount of such fee was competitive with the amount charged by other savings and loan institutions, which charged separately for the third-party services.

Finally, we note that petitioner has consistently treated the loan fee as interest for purpose of complying with Federal "truth in lending" requirements and State usury and tax laws.

Respondent has relied primarily on *Goodwin v. Commissioner, supra*, in support of his claim that a portion of the loan fee was a charge for underwriting services. However, in that case, we made a specific finding of fact that the loan fee therein was charged solely to defray expenses incurred in processing and administering two FHA-insured construction loans. We noted that "Although the amount of each fee was computed as a percentage of the loan amount and bore no direct relation to the actual costs of the specific services performed" (75 T.C. at 441), which facts would tend to indicate a charge for interest, representatives of the lenders stated that the fees were charged to cover the costs incurred in processing such loans, that no portion of such fee was intended to be interest, and that the taxpayer presented no evidence to rebut such testimony.[9] In the instant case, the loan fee was not a charge

---

[9]On brief, respondent urged that all the loan fee income received in connection with petitioner's FHA- and VA-insured loans must be considered compensation for service, citing *Metropolitan Mortgage Fund, Inc. v. Commissioner*, 62 T.C. 110 (1974). However, merely because a particular loan was FHA- or VA-insured does not mean that a loan fee charged on such loan was for services. See *Wilkerson v. Commissioner*, 70 T.C. 240 (1978), revd. on other

for services, but rather was for the use or forebearance of money.[10] See *Blitzer v. United States, supra; Wilkerson v. Commissioner, supra; Western Credit Co. v. Commissioner, supra.*

The only evidence before us which would indicate that the loan fee was a charge for more than interest was a statement in petitioner's application to change its accounting method wherein petitioner indicated that included in such fee was a charge for "points, escrow fees, appraisal fees and inspection fees." This statement, however, was subsequently amended by letter to the Internal Revenue Service wherein petitioner indicated that the fee was a charge for "points which are in the nature of additional interest." Moreover, such statement, standing alone, does not convince us that the loan fee was other than a charge for interest, especially in view of the other evidence presented.

Based on all of the foregoing, and the record as a whole, we hold for petitioner[11] on the issue presented. Due to other adjustments made in the notice of deficiency and not disputed by petitioner, which petitioner claims entitle it to a refund,

*Decision will be entered under Rule 155.*

---

grounds 655 F.2d 980 (9th Cir. 1981). *Metropolitan Mortgage Fund, Inc. v. Commissioner, supra,* does not stand for that proposition. Further, the facts in that case are distinguishable from those herein, and it is therefore not controlling.

[10]See also *House v. Commissioner,* T.C. Memo. 1970–125.

[11]Respondent argues that petitioner had the burden of proving what portion of the loan fee was allocable to services and that it has failed to carry that burden. We disagree. Petitioner had the burden of proving that the loan fee was interest for the use of money. Petitioner's evidence clearly supports that conclusion and petitioner does not contend that any part of the fee was paid for services. While the evidence indicates that at times petitioner did perform what could be characterized as services (escrow and appraisal services), the evidence indicates these were services which were beneficial to petitioner, and petitioner chose not to charge for them. Respondent, in the notice of deficiency, made no effort to allocate a portion of the fee to services rendered by petitioner; he simply used the FHLBB method to put petitioner back in the same position it was in before requesting the change in accounting method. Nor did respondent offer any evidence to prove a proper allocation of the fee to services rendered by petitioner, and it is quite clear that the amount disallowed was far in excess of the value of services rendered by petitioner. Under the circumstances, we reject respondent's argument. See *Wilkerson v. Commissioner,* 70 T.C. 240, 254–256, revd. on other grounds 655 F.2d 980 (9th Cir. 1980); *Goodwin v. Commissioner,* 75 T.C. 424, 441 (1980).